Argued and submitted January 9, 2018, affirmed October 9, 2019

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

HERMAN KENNETH REED,
*Defendant-Appellant.*

Multnomah County Circuit Court
14CR21187, 15CR11789;
A161030 (Control), A161031

452 P3d 995

Defendant appeals judgments of conviction for four sex crimes. On appeal, defendant assigns error to the trial court's denial of his motion to suppress statements he made while in police custody. Defendant contends that he equivocally invoked his right to counsel, while being questioned at a police station, when he asked a detective whether he needed a lawyer. Defendant argues that statements he made after asking that question should have been suppressed because the detective did not cease questioning or clarify whether defendant was invoking his right to counsel. Defendant argues also that statements he made later, after he unequivocally invoked his right to counsel, should have been suppressed because the police detective impermissibly reinitiated questioning by making a statement calculated to provoke an incriminating response. *Held*: First, defendant's question to the detective about whether he needed a lawyer was not an equivocal invocation of his right to counsel. Accordingly, the trial court did not err when it denied defendant's suppression motion with regard to the statements defendant made after asking that question. Second, any error the trial court may have committed in denying the motion to suppress the statements defendant made after he invoked his right to counsel was harmless in the context of this case.

Affirmed.

Edward J. Jones, Judge.

David L. Sherbo-Huggins, Deputy Public Defender, argued the cause for appellant. Also on the brief was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Doug M. Petrina, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Hadlock, Presiding Judge, and DeHoog, Judge, and Aoyagi, Judge.

HADLOCK, P. J.

Affirmed.

## HADLOCK, P. J.

Defendant was convicted, following a bench trial, of sex crimes committed against two young girls. He raises four assignments of error on appeal. In his first assignment of error, defendant challenges the trial court's denial of his motion to suppress two categories of statements that he made while in police custody: (1) statements that he made at a police station, before he unequivocally invoked his constitutional right to counsel, and (2) statements that he made later, after his unequivocal invocation. As explained below, we reject defendant's argument that the trial court erred in denying the motion to suppress statements he made before his unequivocal invocation. With respect to defendant's later statements, made after his invocation, we conclude that we need not decide whether those statements should have been suppressed because any error associated with admitting them at trial was harmless. We reject defendant's second, third, and fourth assignments of error, in which he challenges the admission of "other acts" evidence, without discussion. Accordingly, we affirm.

## I. BACKGROUND AND PROCEDURAL FACTS

We review the trial court's ruling on the motion to suppress for legal error. *State v. Jones*, 296 Or App 553, 555, 439 P3d 485, *rev den*, 365 Or 557 (2019). As noted, we resolve defendant's challenge to one aspect of that ruling (relating to defendant's pre-invocation statements) on the merits. Thus, in analyzing that aspect of the ruling, "we are bound by the trial court's findings of historical fact so long as evidence in the record supports them." *State v. Dodge*, 297 Or App 30, 33, 441 P3d 599, *rev den*, 365 Or 533 (2019). We therefore set out the evidence pertinent to that aspect of the suppression motion "in the light favoring the court's ruling." *Jones*, 296 Or App at 556. However, we resolve defendant's challenge to a second aspect of the trial court's denial of his suppression motion (relating to defendant's post-invocation statements) on harmless-error grounds. "A harmless error analysis is based on reviewing all pertinent portions of the record to determine if there is little likelihood that any error affected the verdict." *Id*. (internal quotation marks and brackets omitted). We describe the evidence pertinent to the

ruling on defendant's post-invocation statements in accordance with that standard.

In 2014, a young girl, N, reported to her family members and others that defendant had touched her private parts. Later the same year, another young girl, S, made similar reports. Both girls eventually were evaluated at CARES, and each disclosed that defendant had sexually abused her.

After N's disclosures were reported, defendant was taken to a police station and interviewed by Detective Pontius, who read defendant *Miranda* warnings, obtained defendant's acknowledgement that he understood those rights, and asked whether defendant had any questions. Defendant responded, "Well, I don't know. Do I need a lawyer?" Pontius told defendant that that was up to him and that Pontius could not make the decision for him or give him legal advice. Defendant said something like, "We can go and you can let me know what's going on."[1] Defendant made arguably incriminating statements. Later in the interrogation, defendant said, "Well, I guess I'm going to need to lawyer up, then," and questioning stopped.

Pontius told defendant that he was being arrested and charged with rape. Pontius worked on paperwork for about half an hour, then drove defendant from the police station to the jail, which took about 15 minutes. During that drive, Pontius noticed that defendant's behavior had changed. Defendant had appeared to take the interview fairly seriously but, during the drive to jail, was "very nonchalant, almost lackadaisical about his approach." Defendant was "kind of singing at some points" and "making fun of" some people standing nearby. About halfway through the drive, Pontius said, "Dude, here's some friendly advice. You need to get your shit together." After a pause, defendant said, "I know. This has been a family curse that needs to be broken at the end of a rope. It's an addiction that I can't seem to get any control

---

[1] That part of the recorded interview appears to have been unclear, perhaps because Pontius and defendant were talking over each other, as one lawyer and the trial court remarked. The transcript on appeal transcribes defendant's statement as "you can let me know what's going on," but a lawyer and the trial court indicated that they heard the statement as "you can tell me what's going on."

over."[2] Pontius later testified, at the suppression hearing, that he had made the "get your shit together" comment in association with defendant's demeanor during the car ride.

Defendant was charged in case number 14-CR-21187 with one count each of first-degree rape, first-degree unlawful sexual penetration, and first-degree sexual abuse, each alleged to have been committed against N. In case number 15-CR-11789, defendant was charged with one count of first-degree sexual abuse, committed against S.

Defendant moved to suppress two sets of statements he made to Pontius: (1) those he made at the police station, after he asked Pontius whether he needed an attorney but before he unequivocally invoked his right to counsel, and (2) those he made during the drive to jail, after Pontius remarked that defendant "need[ed] to get his shit together."[3] Defendant argued that the first set of statements should be suppressed because he had equivocally invoked his right to counsel by asking Pontius whether he needed an attorney, and Pontius had neither ceased the interrogation nor asked questions to clarify whether defendant was invoking his right to counsel. Defendant argued that the second set of statements should be suppressed because, after he ultimately unequivocally invoked his right to counsel at the police station and interrogation stopped, Pontius impermissibly reinitiated interrogation during the drive to jail when he "made statements to [defendant] that were absolutely calculated to provoke an incriminating response." The trial court denied both aspects of defendant's suppression motion, although it was "a little more troubled" by Pontius's comment to defendant during the drive to jail, which the court viewed as "an invitation to talk about the case" that was "provoking further discussion" on that topic.

Defendant waived his right to a jury, and the case was tried to the court. We briefly summarize the most pertinent

---

[2] Additional conversation between defendant and Pontius followed, but none of those subsequent statements were admitted at trial, so we do not quote them here.

[3] Defendant filed the written motion only in case number 14-CR-21187. However, at the suppression hearing, the court and parties treated the motion as relating to both of the cases, which were joined for trial.

evidence to provide context for the discussion that follows. N's mother testified that, in 2013 and 2014, she and N had regularly spent nights at defendant's home. N's mother testified that defendant was a father figure to N and that he often took care of her, particularly while N's mother was at work. At some point in 2014, N's mother and other individuals started to notice times when N was rubbing her vaginal area. Eventually, after being asked a few times about that behavior and whether anybody had ever touched her, N said that defendant had. N's mother also testified about two times that N went to CARES for evaluation. After N's disclosures, N's mother stopped spending nights at defendant's home.

Two friends of N's mother also testified as to statements that N made about defendant having touched her. Once, when one of those friends was giving N a bath and asked N to stand up to be washed, N said, "Just please don't go inside me." The friend asked who had done that to N, and the child responded that defendant had. The other friend testified that N had said that defendant "had put his pee-pee" and then pointed to her genital area. The friend asked if it had happened more than once and N said yes.

S's mother also was friends with defendant; she and S spent a lot of time with him. S's mother occasionally allowed S to spend the night at defendant's house, where S sometimes played with N. A few weeks after N's mother stopped staying at defendant's house, S's mother left S there one evening. The next day, S told her mother that defendant had "put pee-pee medicine on her privates." S's mother called defendant, who gave "a bunch of excuses of what she may have thought the pee-pee medicine was." At that point, S's mother called N's mother because she wanted to know why N was not at defendant's house any more. S's mother testified that N's mother said that N "was saying the same thing"; N's mother testified that she told S's mother "that she needed to listen to her daughter."

A counselor who works at CARES as a child interviewer testified generally about CARES evaluations and about her interview of N, which occurred on N's second visit

to CARES.[4] N was then four years old. N told the interviewer that defendant had "got right there with his peepee," pointing between her legs. N said that what defendant did was "[n]ot okay" and that it happened more than one time. She also said that defendant "pushed in there" when he put his "pee-pee," which looked like a big snake stuck to his body, in N's "pee-pee." N asserted that "medicine" had "came out of [defendant's] pee-pee and went right inside" of N. N also indicated that defendant touched her genital area with his finger, which got "inside there." N responded negatively when asked about other types of sexual touching and she denied being sexually touched by anybody other than defendant.

Another CARES interviewer testified about his interview of S, which took place when she was just under six years old, months after the incident at defendant's home.[5] During the first part of the interview, when he and another CARES worker explained to S that their job was to make sure that she was healthy and safe, S said that her friend, N, had been hurt by defendant. S said that she had heard that from her mother.[6] S also said that defendant had "peed on her" (meaning S) when she was in his bedroom, that "the pee went in her pee-pee and it burned." She described defendant's "pee-pee" as looking like a very big stick. On cross-examination, the CARES interviewer acknowledged concern about S's mother having told S that defendant had sexually abused N; one reason for concern is that S was at a "fairly suggestible" age. However, S herself "did not seem particularly suggestible" during the interview and she denied that

---

[4] The first time that N was taken to CARES, she was only three years old, and she was not interviewed beyond an initial checkup "due to her young age and distractibility." During that short first visit, N's statements about baths led to concerns about "possible inappropriate boundaries," but she did not disclose anything of an overtly sexual nature and, at one point, said "No one did do anything to me." An anogenital examination performed during that first visit was normal, neither confirming nor ruling out abuse.

[5] S's mother did not immediately report S's disclosures, at least in part because she has not had a good working relationship with the Department of Human Services (DHS) in her life. Police started investigating defendant's conduct with S in conjunction with their investigation of N's reports of abuse; it was then that S's mother told police what S had said about defendant.

[6] At trial, S's mother denied having given S that information, although she thought S might have overheard it.

defendant had touched any part of her body, except by "peeing" on her.

Both children testified at trial. N, who was then five years old, identified defendant and said that she had not seen him in a while because "he hurts my feelings". When asked what she meant by that, N testified that she did not "like it when he hurts me like that" and, after another question about what she meant, said that defendant hurt her in her "private parts." As questioning continued, N testified that defendant hurt her "almost every single night" and that he touched her, including inside her private part, with his own private part and with his fingers.

S also testified; at the time of trial, she was six years old. S was reluctant to identify anybody in the courtroom whom she recognized other than her parents and the prosecutor; she testified, "Don't want to say it." When asked about defendant by name, she said, "Don't like it." She then whispered and, when the prosecutor asked her to speak up a little louder about why she did not "like talking about" defendant, S said, "Pee." The prosecutor asked S what she remembered about the pee, and S said, "it coming out" from defendant's "pee-pee." S testified that she was lying on defendant's bed in his bedroom when that happened, that defendant was standing up, and that the pee got on her privates. S testified that defendant's pee-pee looked like a stick. What happened made S feel mad.

Detective Pontius testified and, through him, the state introduced the statements by defendant that were the subject of defendant's suppression motion. Pertinent to the issues on appeal, Pontius testified about having said to defendant, on the drive from a police station to jail, "Dude, here's some friendly advice. You need to get your shit together." Pontius then reported defendant's response, to the best of his recollection: "I know. This has been a family curse that needs to be broken at the end of a rope. It's an addiction * * * I can't seem to get any control over."

Defendant called two witnesses at trial. The first witness, Steinman, used to date defendant and, during that relationship, she became acquainted with S's mother. In Steinman's opinion, S's mother is not a truthful person.

Defendant's second witness was a psychologist who used to work as a child interviewer at CARES and who led a team that drafted the first version of the Oregon guidelines for interviewing children. The psychologist testified about the possible effect of N's mother having repeatedly questioned N about possible touching before the second CARES interview, explaining in detail why such questioning could lead a child to go along with what she thinks her parent wants to hear.

The psychologist also testified about concerns associated with S reporting that her mother had told her what defendant had done to N. Given the amount of time that passed between when S spent the night at defendant's house and when the CARES interview occurred, "and suddenly the child's being influenced about something that happened with another child, * * * they may add some of that to their own memory. They may begin to think, gosh, maybe something like that happened to me." The psychologist also testified about other reasons that S's memory may have faded over time.

On cross-examination, the psychologist acknowledged that the CARES interviewer did a good job in interviewing N, that the statements N made were age-appropriate, and that research shows that the kind of details N gave "are correlated with accuracy." The psychologist also acknowledged that, in describing what defendant had done to her, S did not report all of the same types of things that she believed defendant had done to N.

The trial court found defendant guilty of all charges: one count each of first-degree rape, first-degree unlawful sexual penetration, and first-degree sexual abuse with N as the victim, and a single count of first-degree sexual abuse with S as the victim. In announcing its verdict, the court stated that it found N and S to be credible and that it was "convinced beyond a reasonable doubt that [defendant] engaged in all those behaviors."

At a later sentencing hearing, the state advocated for consecutive sentences that would result in a total incarceration period of 675 months, emphasizing defendant's prior convictions for other sex crimes against children. In

response, defendant argued against consecutive sentences, noting that—even without such sentencing—he would be in his mid-70s when released, given the mandatory-minimum 300-month sentences on the rape and sexual-penetration convictions. After further proceedings, including statements from S and her family members, defendant took advantage of his opportunity to speak. The first thing that defendant mentioned was what he called the prosecutor's "antics" of referencing defendant's past crimes, which he characterized as "being reconvicted again for something I already did." Defendant accused other people of having behaved badly and complained about his lawyer. Defendant then complained about Pontius, appearing to dispute the officer's account that defendant had been laughing at homeless people during the drive from the police station to jail. Defendant characterized himself as somebody who helped homeless people and others. Defendant concluded by asserting briefly that he would have pleaded guilty if he had committed the crimes.

In response, the court observed that it knew that defendant had good deeds in his past, but the court commented that that "really [did not] have anything to do with what [the court] heard from those kids on the stand." The court continued its colloquy with defendant:

"THE COURT: And the same way. I don't really, bluntly, care what happened between you and the detective beyond what rulings I made about it.

"THE DEFENDANT: Uh-huh.

"THE COURT: Because it was the kids that got up on the stand and told me what happened. That's what it was about.

"THE DEFENDANT: And they all said I didn't do nothing either.

"THE COURT: Well—

"THE DEFENDANT: Why wasn't they threatened? Why didn't I threaten the families? Why didn't I do this? Why didn't I do that?

"THE COURT: Well—

"THE DEFENDANT: That's what sex offenders do if you read the history.

"THE COURT:   No.

"THE DEFENDANT:  And—you know, and people that are bad. That's what they do. Like I said, my past is being used against me. I'm a target. That's okay. They got to live with it.

"THE COURT:   There's no doubt that your past plays into this sentence. That's absolutely true.

"THE DEFENDANT:   Yeah. It's like double jeopardy.

"THE COURT:   Now I want to keep you focused on the what we heard from those children.

"THE DEFENDANT:   Uh-huh.

"THE COURT:   That's what the trial was about. And as you already know, I found them to be persuasive.

"THE DEFENDANT:   Well—

"THE COURT:   I believed what I was told by those children about what happened to them.

"THE DEFENDANT:   They had good coaches. That's all I could say.

"THE COURT:   Well, and had I believed they had been coached, I might have come to a different conclusion than I did.

"THE DEFENDANT:   Uh-huh.

"THE COURT:   I'm very sensitive to the possibility of coaching, and I was persuaded that that's not what I heard when those children were here.

"THE DEFENDANT:   Uh-huh.

"THE COURT:   So, you know, as far as good things in your life or other people's bad things *or the detectives* or whatever, really it all just comes down to those two kids on the stand and what they told me.

"THE DEFENDANT:   Uh-huh.

"THE COURT:   I believed them.

"THE DEFENDANT:   That's—that's okay.

"THE COURT:   And that's what—

"THE DEFENDANT:   That's your opinion.

"THE COURT:   That's what it comes down to. And so that's what got us to where we are today."

(Emphasis added.)

## II.   ANALYSIS

### A.   *Defendant*'s *Statements at the Police Station*

On appeal, defendant renews both of the arguments that he made in conjunction with his suppression motion. First, he contends that he equivocally invoked his right to counsel when, after being read his *Miranda* rights at the police station, he asked Pontius, "Do I need a lawyer?" Defendant further argues that Pontius's statements following that equivocal invocation went beyond permissibly clarifying whether defendant was invoking his right to counsel. *See Dodge*, 297 Or App at 41 ("any questioning that follows an equivocal invocation of the Article I, section 12, [of the Oregon Constitution] right to counsel must clarify whether the suspect is invoking *that right to counsel*" (emphasis in original)). In response, the state argues that defendant's question "was not even arguably an actual assertion of the right to counsel" but, at most, showed that "defendant was contemplating making an invocation."

The state is correct. *See State v. Roberts*, 291 Or App 124, 133, 418 P3d 41 (2018) (the defendant did not equivocally invoke his right to counsel by asking, "Do I need one?" after he was read *Miranda* rights; the only reasonable interpretation of that question was that the defendant "had not yet formed any intent to invoke his right, and was seeking additional information that the detectives were not required to provide"). The trial court therefore ruled correctly when it denied defendant's motion to suppress statements that he made at the police station, after he asked Pontius whether he needed a lawyer but before he unequivocally invoked his right to counsel later in the interview.[7]

---

[7] The parties agree, and so do we, that defendant unequivocally invoked his right to counsel when he told Pontius, "I guess I'm going to need to lawyer up, then." *See State v. Acremant*, 338 Or 302, 322, 108 P3d 1139, *cert den*, 546 US 864 (2005) (defendant's statement—"I think that I do need a lawyer. I do"—unambiguously expressed his desire to consult with counsel before speaking with detectives).

B.   *Defendant's Statements During the Drive to Jail*

Defendant's second argument is that the trial court should have suppressed statements that he made in the police car, which occurred after defendant's unequivocal invocation. Defendant contends that Pontius impermissibly reinitiated interrogation when he made a statement— "Dude, here's some friendly advice. You need to get your shit together"—that was reasonably likely to elicit an incriminating response. Defendant argues that both the tone and content of Pontius's statement "implored defendant to reflect on the charges at hand, the circumstances he was in, and the consequences he was facing." Because "a reasonable officer would have known that advising defendant that he needed to get his shit together was likely to provoke an incriminating response," defendant asserts, Pontius's comment constituted interrogation, and the trial court erred by not suppressing defendant's response. Defendant further contends that the court's error was not harmless because defendant's responsive statement about a "family curse" and an "addiction" that he could not control was admitted at trial, and it constituted compelling evidence of defendant's guilt that likely affected the verdict.

The state's response is two-fold. First, the state argues that Pontius's comment during the drive to jail was not interrogation. That is so, the state contends, because that comment "was not reasonably likely to elicit an incriminating response." The state points to Pontius's testimony during the suppression hearing that he made the comment in response to defendant's demeanor in the police car. Given that context, the state asserts that defendant was unlikely to respond at all or, if he did, the response was unlikely to be incriminating. The state further argues that, even if defendant is correct that Pontius's comment "likely would lead him to reflect on his charges, his circumstances, and the seriousness of his situation," the comment still did not constitute interrogation because it was not *designed* to elicit an incriminating response.

Second, the state argues that, even if the trial court erred in denying defendant's motion to suppress his statements in the police car, that error was harmless. The state

does not attempt to downplay the potential power of defendant's admission to a "family curse" and an uncontrollable "addiction." Rather, the state points to comments that the trial court, sitting as factfinder, made when it announced its guilty verdict and, later, at sentencing; in those remarks, the court emphasized that it had found N and S credible and that its verdict "was about" what the children had said on the stand.

For the reasons set out below, we agree with the state that any error the court may have committed in denying defendant's motion to suppress his post-invocation statements was harmless. Accordingly, we need not address defendant's challenge to that ruling, and we express no opinion on whether Pontius's remark to defendant during the drive to jail constituted impermissible interrogation.

"If error is harmless, this court is required to affirm a defendant's conviction even when a trial court commits error; and error is harmless if there is little likelihood that the error affected the verdict or substantially affected the defendant's rights." *State v. Garcia*, 284 Or App 357, 363, 392 P3d 815, *rev rev den*, 361 Or 645 (2017). Significantly, this is not a more typical kind of case, in which the state's harmless-error argument depends on an analysis of how the erroneously admitted evidence compares with other evidence admitted at trial. *See, e.g.*, *State v. Simon*, 294 Or App 840, 849, 433 P3d 385 (2018) (describing ordinary method of assessing whether evidentiary error was harmless as involving a consideration of "the nature of the evidence in the context of the trial as a whole," including factors such as whether the evidence was cumulative, how the case was tried, and the extent to which the evidence was central to the parties' presentations and theories of the case). Rather, in this case, the state's harmless-error argument depends on comments that the trial court made when delivering its verdict and at sentencing. We therefore look to other cases addressing harmless-error arguments premised on a trial court's comments about its verdict.

In that regard, it bears emphasizing that "a trial court's failure to mention contested evidence when explaining its disposition does not necessarily establish that any

error in admitting that evidence was harmless." *State v. Klontz*, 257 Or App 684, 702, 308 P3d 214 (2013). Rather, the court's speaking verdict and other comments must be considered in context, taking into account the circumstances in which the court made its observations and the extent to which the court's explanation of its verdict sheds light on how it viewed the evidence.

*State v. Jones*, 255 Or App 761, 298 P3d 652, *rev den*, 354 Or 62 (2013), provides an example of the circumstances in which a speaking verdict demonstrates the harmlessness of any evidentiary error. In that case, the defendant was charged with sexually abusing two young girls, both of whom testified at trial and one of whom testified that the defendant had "attempted to engage her in certain urine-related activities." *Id*. at 762. The state, over the defendant's objection, also presented evidence that the defendant had previously sexually abused and engaged in urine-related activity with three other children. *Id*. The trial court, sitting as factfinder, found the defendant not guilty of all charges related to one child and found him guilty of some charges related to the second child, J. *Id*. at 762-63.

On appeal, the defendant argued that the evidence related to his abuse of other children had been erroneously admitted. *Id*. at 763. We did not reach the merits of that argument because, based on the court's discussion of its verdict, we concluded that any error in admitting the evidence was harmless. *Id*. We focused on two aspects of the court's explanation of its decision making. First, the court stated that it believed J and had reached its guilty verdict "based on her testimony." *Id*. Second, the court stated that the other complainants' testimony "didn't have a big impact" on the verdict and whether the court believed J. *Id*. Those explanations, taken together with the absence of anything "demonstrat[ing] that the trial court gave an inaccurate description of the basis for its verdict," led us to conclude that there was little likelihood that admission of the challenged evidence affected that verdict. *Id*. at 763-64. *See also State v. Hunter*, 141 Or App 73, 77, 77 n 5, 918 P2d 104, *rev den*, 324 Or 78 (1996) (any error in admitting prior-acts evidence in bench trial was harmless where the trial court's explanation of its verdict "relie[d] primarily" on other evidence, the challenged

evidence was similar to different evidence that was admitted without objection, and the trial court mentioned the challenged evidence only in "a fraction" of its findings, "the bulk of which focused" on other evidence).

*Klontz* provides another example. In that case, as in *Jones*, "prior acts" evidence was at issue. 257 Or App at 700. And, as in *Jones*, we affirmed without resolving whether admission of that evidence was erroneous because the court's speaking verdict persuaded us that any error was harmless. *Klontz*, 257 Or App at 702-03. In *Klontz*, we emphasized the length and comprehensiveness of the court's speaking verdict, ascribing significance—in that context—to the trial court having not mentioned the challenged "prior acts" evidence. *Id.* at 702. Given "the trial court's specific findings on the dispositive issues," we concluded that there was little likelihood that the court's verdict was affected by any error in admitting the challenged evidence. *Id.* at 703.

Finally, *State v. Montgomery*, 217 Or App 139, 174 P3d 1040 (2007), *rev den*, 344 Or 671 (2008), demonstrates that the erroneous admission of evidence may still be harmless, even if the factfinding trial court describes that evidence as having a corroborative effect, if the record demonstrates that the court would have found the defendant guilty even in the absence of that erroneously admitted evidence. In that case, the defendant accused of sexually abusing a young child had made inculpatory statements to a detective during an interview. *Id.* at 141. Those statements were admitted over the defendant's objection during a bench trial; the child and her mother also testified. *Id.* at 142. The trial court made oral findings regarding the credibility of the victim and her mother and then gave the following explanation of its guilty verdict:

> "'Based upon what I have observed from [the testimony of the victim and the victim's mother], I would be convinced beyond a reasonable doubt of [defendant's] guilt. However, his statements are solid corroboration of the evidence * * *.'"

*Id.* at 143 (brackets and ellipsis in original). In that context, we determined, any error in admitting the defendant's inculpatory statements to a detective was harmless because

the court's explanation demonstrated that it would have found the defendant guilty even if his statements had not been introduced into evidence. *Id*.

As the cases outlined above demonstrate, however, context is everything—and consideration of context has sometimes led us to conclude that erroneous admission of evidence was *not* harmless in bench trials. *See, e.g., State v. Lopez-Cruz*, 256 Or App 32, 38-39, 299 P3d 569 (2013) (concluding that error in admitting evidence was not harmless in "the absence of a statement by the trial court that it did *not* consider" that evidence) (emphasis in original). Even when the court's speaking verdict explains that the court's decision turned on the credibility and corroboration of a certain witness's testimony, erroneous admission of other evidence may still be harmful if that evidence "bore directly" on that credibility and corroboration. *State v. Wood*, 253 Or App 97, 102, 289 P3d 348 (2012) (error in admitting a complainant's early statements, to a social worker, about alleged abuse was not harmless because those statements reinforced the complainant's trial testimony). *See also State v. Davilia*, 239 Or App 468, 473, 478, 244 P3d 855 (2010) (erroneously admitted diagnosis of "highly concerning for sexual abuse" required reversal because, although case was tried to the court, the case came down to a "swearing contest" between the defendant and the four-year-old victim, the diagnosis "went to the key issue in the case," and the trial court had specifically questioned the witness who made the diagnosis about it, "providing some indicating that it considered that information to be important").

In this case, we find the trial court's announcement and explanation of its verdict significant, for reasons we discuss in detail below. Preliminarily, however, we discuss some other statements that the court made, just before trial, because defendant contends that those pretrial statements should lead us to reject the state's harmless-error argument.

On the morning of the first day of trial, defendant submitted written waivers of his right to a jury trial. The transcript reflects that the parties and the trial court had an off-the-record discussion about the court's "practice for court trials." Then, on the record, the court said that it did not

have a formal, consistent practice either of making express factual findings or of not making them. In some cases, it had "just provided a result and moved on" and in other cases, it had given "some discussion." At that point, defendant raised the specter of other trial judges who, defendant asserted, "went out of their way to say that every piece of evidence that they let in pretrial they did not consider so that there was no chance of the case being reversed." The trial court disclaimed any intention of doing that, saying that it "[did not] have any problem saying that if it's in, it's in." The court said it was "comfortable with that," and asked rhetorically, "How could I not be comfortable with doing what I always do?"

Defendant essentially contends that those pretrial statements preclude us from considering whether the trial court's later statements—made when delivering the verdict and at sentencing—render any error harmless. We disagree for at least three reasons. First, the harmless-error analysis is constitutionally mandated and is an appellate inquiry. It is our task to determine whether the record reflects that there is little likelihood that any error affected the verdict. The trial court cannot, through a pretrial description of its normal practices in announcing verdicts in bench trials, prevent us from considering that question. Second, we understand the trial court to have been stating only that it would not make findings in such a way as to *intentionally* insulate its verdict from reversal on appeal. Such a declaration has little to do with whether, in light of subsequent developments at trial and the trial court's post-trial discussion of the evidence, we can discern whether any error in admitting specific evidence is likely to have influenced the trial court's verdict. Third, a harmless-error analysis that turns on a trial court's statements is a fact-based, highly contextual inquiry. We acknowledge the possibility that a trial court's pretrial statements could, in some circumstances, affect our determination of whether any subsequent error was harmless. In this case, however, the trial court's pretrial statement that "if it's in, it's in" sheds no light on the extent to which the challenged evidence *actually* may have affected the court's verdict—and that is the question that we must address on appeal.

We turn to that question, first considering the trial court's statements about the evidence it found significant. The court repeatedly emphasized that it found N and S to be credible. The court used just those words when it announced its verdict: "I found *** the two children to be credible." Later, at sentencing, the court more specifically identified "what [it] heard from those kids on the stand" as the basis for its decision, explaining "[t]hat's what it was about"—"it was the kids that got up on the stand and told me what happened." Then, when defendant continued to discuss other matters, the court attempted to "keep [him] focused on *** what we heard from those children" because "[t]hat's what the trial was about" and the court had "found them to be persuasive." When defendant interjected, the court reiterated that it "believed what [it] was told by those children about what happened to them." And, when defendant protested further, the court stated again that "really it all just comes down to those two kids on the stand and what they told" the court, which "believed them." The court concluded its explanation by stating: "That's what it comes down to. And so that's what got us to where we are today." Thus, the court stated repeatedly that it believed the children's in-court testimony *and* that it reached its verdict because of that testimony. In other cases holding that evidentiary error was harmless, we have relied heavily on similar statements by trial courts. *See Klontz*, 257 Or App at 702-03 (basing harmless-error analysis in "prior acts" case in part on the court's assessment of the victim's credibility on its own terms, without reference to any aspect of the defendant's history); *Jones*, 255 Or App at 763 (basing harmless-error analysis, in part, on trial court's expressed belief of a victim and statement that its verdict was based on her testimony).

Moreover, the court explained at sentencing that it had not blindly accepted the children's testimony about defendant's conduct. It described itself as "very sensitive to the possibility of coaching" and said it had not "heard" coaching when the children testified. The court went so far as to explain that, if it had thought that the children had been coached, it might have decided the case differently. Those comments corroborate the court's assertion that its

verdict "was about" the children's testimony; if the verdict had been based on something else, like defendant's statements to Pontius, the possibility of coaching would not have been so important to the court's deliberation.

Not only did the court repeatedly describe the evidentiary basis for its verdict, it also at least suggested that it had not relied on defendant's statements to Pontius. When defendant complained about Pontius's characterization of his demeanor on the ride to jail, the court explained that it did not "care what happened between you and the detective beyond what rulings" it had made "[b]ecause it was the kids that got up on the stand and told me what happened. That's what it was about." And, again, after defendant suggested that the children had been coached, the court tried to focus defendant on what mattered in the case, stating first that it was persuaded that the children had not been coached and then emphasizing that, "as far as *** the detectives or whatever, really it all just comes down to those two kids on the stand and what they told me." Thus, to the extent that the court mentioned defendant's statements to Pontius at all, it was only to deny their significance to its verdict. This is not a case in which the court suggested that the challenged evidence helped corroborate or was consistent with other evidence (like victim testimony) admitted at trial. *Cf. State v. Stanley*, 287 Or App 399, 408-09, 404 P3d 1100 (2017) (error in admitting evidence resulting from warrantless search not harmless in bench trial where trial court described that evidence as consistent with the victim's version of events).

In sum, the court's statements about its verdict reflect careful consideration of the credibility of the victims' in-court testimony, its belief that the children were being truthful, its reliance on their statements, and its nonreliance on the post-invocation statements to Pontius that defendant challenges on appeal. As in *Jones*, "[n]othing in the record demonstrates that the trial court gave an inaccurate description of the basis for its verdict." 255 Or App at 763. Given the totality of those circumstances and considering the court's remarks in context, we conclude that any error associated with the denial of defendant's motion

to suppress his post-invocation statements to Pontius was harmless.

Affirmed.