No. 103 February 19, 2026 145

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

DAVID DOUGLAS MILLER,
*Defendant-Appellant.*

Lane County Circuit Court
20CR40401; A182292

Debra E. Velure, Judge.

Submitted April 21, 2025.

Ernest G. Lannet, Chief Defender, Criminal Appellate Section, and Neil Francis Byl, Deputy Public Defender, Oregon Public Defense Commission, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Lauren P. Robertson, Assistant Attorney General, filed the brief for respondent.

Before Ortega, Presiding Judge, Hellman, Judge, and O'Connor, Judge.

ORTEGA, P. J.

Affirmed.

**ORTEGA, P. J.**

Defendant appeals a judgment of conviction for third-degree sexual abuse, asserting two assignments of error. First, he assigns error to the trial court's denial of his motion for a mistrial after a witness testified that defendant had asked her—an Oregon Department of Human Services (ODHS) caseworker—if he should get an attorney. Defendant argues that the trial court's actions—striking the testimony and providing a curative instruction directing the jury to disregard it—were not sufficient to cure actions that deprived him of his right to a fair trial. Second, defendant assigns error to the trial court's admission of expert testimony about offender manipulation strategies (sometimes termed "grooming" evidence). The trial court admitted the evidence to help the jury "understand why a child might * * * act[] counterintuitively" by not making an immediate 9-1-1 call when defendant—her grandfather—touched her sexually, and why she had not previously reported him touching her in ways that made her uncomfortable. We conclude that the trial court did not err in either respect and affirm.

## FACTUAL BACKGROUND

We begin with an overview of the evidence to provide some general background, and we provide more detailed background and context that is pertinent to the first assignment of error. We will provide more background and context as pertinent to the second assignment of error in the discussion of that assignment.

Defendant is H's grandfather. He was living with his wife in a camper van on the same property as H and her family when H was 16 years old. H had two younger brothers who lived there with her.

At one point after defendant moved to the property, defendant bought H a laptop computer despite H's mother telling him not to. According to H, defendant also sometimes provided H with marijuana and smoked it with her.

H testified at trial about an occasion when she and defendant were on a road trip to the coast. Defendant put his hand on H's thigh and told her that he loved her. H

was uncomfortable, but told defendant that she loved him, too. A few days later, when defendant again touched her thigh, H felt uncomfortable and told defendant to stop. On another occasion, defendant asked H to get something for him out of the back of a van. While she was reaching for it, he "smack[ed]" H's butt. H thought her brother was responsible, and she slapped him. Defendant laughed and said that he was the one who had done it. H said, "I hate you for this," and defendant apologized.

H testified that, on the evening that led to the charge in this case, she was with defendant, her cousin, and her cousin's friends in defendant's camper van. After the cousin and her friends left, defendant and H wanted to smoke marijuana. H proposed that they smoke in the kitchen, but defendant wanted to smoke in H's room inside the house, so that is where they went. It was very unusual for them to smoke there; usually, they would smoke outside on the porch or in the kitchen. H's brothers were home, but one was playing video games in the living room and the other was asleep.

H sat on her bed, and defendant came in and sat right next to her, facing her. Defendant and H smoked marijuana and listened to music. Defendant began touching H, explaining that he was doing it "to calm [her] down and try to relax" her so she would "not be so stressed out about everything." Defendant also told H that she should close her eyes "and act like it's not even him doing it." Defendant started by rubbing her thighs, then moved his hands up her leg, pushing up her shorts so that he could rub her vaginal area, "as much as he wanted."

After doing this for about thirty minutes, defendant went outside to smoke a cigarette. While he was gone, H covered her legs with a blanket, tucking it under her legs in hopes of preventing defendant from reaching under it. Defendant returned to the bedroom and pushed his hand under the blanket so that he could resume touching H's thighs and vaginal area. After a while, he left again, and H put on sweatpants and covered herself again with the blanket.

When defendant returned and discovered that H had put on sweatpants, H noticed that he looked "very frustrated,

like he was really angry" with her for "trying to cover \* \* \* up." Defendant then began groping H's breast by reaching through the armhole of her tank top and pulled her nipple, which she testified was painful. Defendant continued groping her breast for about 20 minutes. Then defendant stopped and, as he left the room, told H she was "his favorite girl."

While all of that was happening, H "wanted to die" and "didn't want to be on this planet anymore." She felt disgusted by herself. She had thought she "was loved by [her] grandpa, and then it just proved to [her] that, no, [she] was not." She was also worried that her whole family would think that it was her fault, that she was being "a slut." She worried in particular about what her grandmother would think.

H called a friend, Jason, and told him what had happened. She was still on the phone with Jason when defendant came back into her room. Without hanging up, H hid her phone under a pillow. Defendant told her in a stern voice not to tell anyone what he did. H was afraid of what would happen if she told anyone. She was 4'11", and defendant was a "big person" who had been in the military; H knew he could physically overpower her.

Nevertheless, H told Jason by text and in a phone call what had happened, and also told her cousin, C, either the same night or the next day.

The next morning, H told her grandmother what had happened. She considered her grandmother to be her best friend. Her grandmother said, "Don't worry, he does this, I will talk to him about it." H then told her mother what had happened, and her mother told her to go wait in her room. Her mother then confronted defendant and told him to move off the property. Neither H nor her mother called the police or contacted ODHS at that time.

## DENIAL OF MISTRIAL

About two weeks later, someone made an anonymous report to ODHS, and the agency conducted an assessment. An ODHS case worker, Biehler, interviewed H, who was worried about the repercussions of her marijuana use; she did not want her mother to get in trouble or to be taken

away from her mother "for a situation that [her mother] didn't cause." H confirmed to Biehler that defendant had touched her private parts, and Biehler did not discuss those allegations further with H. She explained that it is ODHS practice that once the person performing the child welfare assessment has probable cause that sexual abuse has occurred, they do not discuss it further but instead arrange for the child to go to a children's advocacy center for a child abuse assessment.

At trial, Biehler testified about speaking with defendant as part of her child welfare assessment. She spoke with defendant outside his home, on the porch. At the time, police had not contacted defendant; no police were present during the interview with Biehler, and she did not refer to criminal charges. Biehler testified that she explained to defendant that she was there because of allegations that he had provided marijuana to H and that he had touched her private parts. Defendant denied doing either of those things.

Biehler testified that it was "an odd interview" because defendant "seemed very relaxed" and "didn't appear to be shocked or upset" by what she was asking him. She explained that "[m]ost people kind of freak out, and they get really defensive. And I'm not saying he should act like most people, but it still was—it threw me for a little bit." At one point, defendant told Biehler that H's brothers had been in and out of the room when he and H were together in her bedroom. Biehler asked defendant, "[W]hat would you think if I told you the boys said they weren't in and out of the room?" Defendant responded that he did not know what to say.

Asked to characterize defendant's responses to her questions, Biehler answered that defendant did not have "an answer for any of it." She said, "He just kept saying, [']I didn't touch her private areas.[']" The portion of the direct examination that led to the motion for a mistrial occurred next:

"[Prosecutor:]   Okay. And then can you tell us about the end of the conversation?

"[Biehler:]   That was—that was—never had asked before. He asked me if he should get an attorney. And I said, why would you need an attorney?

> "[Defense Counsel Plummer:]    Sorry. Your Honor, could we have a moment?
>
> "[Defense Counsel Tinker:]   I'm going to also ask to strike that."

Defense counsel clarified that they had an objection and a matter for the court.

> Outside the presence of the jury, the parties made arguments to the court:

> "[Defense Counsel Tinker:]   Your Honor, at this time, I would be—I'm moving for a mistrial. I think this is *per se* grounds—just on the—on the statement, alone, [of] Ms. Biehler * * * that she's saying that [defendant] had requested an attorney. * * * I don't think the jury can unhear what she just spoke about. So at this time, I'm asking for a mistrial."

The prosecutor asked for a few minutes to do some legal research, and the court agreed.

After a 30-minute recess, the court reconvened, still outside the presence of the jury. Defense counsel argued that it had been clear for decades, under both state and federal constitutions, that the prosecution may not elicit testimony, purposely or not, that reveals the invocation of the right to an attorney. Defense counsel contended that the court had to determine whether, in context, a curative instruction could be sufficient to address the error, which would involve an examination of whether the invocation of the constitutional right raises an inference that the right was invoked because the person is guilty, and whether that inference is likely to be drawn by the jury.

The court asked whether the "invocation of the right to counsel" had to be "unequivocal." Defense counsel contended that it did not, emphasizing that the question is whether the testimony creates "an impermissible inference that the person is asking for an attorney * * * because they are guilty[.]" Defense counsel then went on to characterize the context of the testimony, arguing that Biehler had testified that defendant's conduct was

> "evasive, or he acted weird. I've never seen anyone do this before. You know, kind of going on at some length about

how odd she found his affect, which, frankly, I thought was borderline inappropriate testimony as it was.

"And then to follow up and say, oh, well, and then he asked me whether I should get an attorney. It—it's such an obvious inference in that context that he's asking for an attorney because he's guilty. She said he never provided an explanation. He couldn't answer questions. Usually people freak out. He didn't do that.

"* * * * *

"The clear inference of that, that the jury is going to draw, and that the witness is implying very directly is that he's guilty. He has something to hide. So I think in that context, it's prejudicial. It cannot be cured with a curative instruction, and a mistrial is required at this point."

The state disagreed, arguing that testimony describing that someone "not involved in the criminal process" possibly wanted an attorney could not be considered testimony about an "invocation" of the right to counsel. She emphasized that there were no police present, that police had not contacted defendant about the allegations, and that, at that point, defendant did not even know whether the allegations had gone to the police at all. The state opposed the motion for mistrial, but it agreed with the court that a curative instruction would be appropriate.

The trial court denied the motion for a mistrial and began crafting a curative instruction. It noted that it would strike the testimony, and that it was important to provide the curative instruction immediately. Ultimately, the court gave the following instruction to the jury:

"THE COURT:     * * *. So I need to start off here and explain that, outside the presence of the jury, I have sustained an objection, and I am striking testimony that was just made by this witness.

"This witness testified regarding a statement from [defendant] related to a request for counsel. That is absolutely inappropriate for you all to consider in any way in your deliberations. It is not an indication of guilt or innocence of the Defendant and should not be used in any fashion. You must disregard that statement and not use it in any way in arriving with your decision today. I see you all

nodding and understanding that instruction. So with that, we'll go ahead and continue with the direct examination of this witness."

The prosecutor then resumed direct examination of Biehler on a different topic.

We review the denial of a motion for a mistrial for abuse of discretion and will reverse only if the defendant was denied a fair trial. *State v. Veatch*, 223 Or App 444, 455-56, 196 P3d 45 (2008). Witness testimony about a defendant exercising a constitutional right (such as the right to counsel) may lead to the denial of the right to a fair trial if, in context, the jury was likely to infer a defendant's guilt from their exercise of the constitutional right.[1] *Id.*; *see also State v. Smallwood*, 277 Or 503, 505-06, 561 P2d 600, *cert den*, 434 US 849 (1977) (affirming denial of a motion for a mistrial after concluding that the jury was not likely to draw adverse inferences of guilt under the circumstances). Our examination includes "the context in which defendant made

---

[1] On appeal and before the trial court, defendant has referred to the testimony about his inquiry regarding whether he should get a lawyer as an "invocation" of a constitutional right, or as "invoking" the right to counsel. Typically, a defendant's question about whether they should get a lawyer, or need a lawyer, does not constitute an invocation of the right to counsel. *See, e.g.*, *State v. Scott*, 317 Or App 777, 786, 505 P3d 1007 (2022) ("We consider whether defendant's question about whether she should ask for a lawyer was an invocation of her right to counsel and readily conclude that it was not."); *State v. Reed*, 299 Or App 675, 686, 452 P3d 995 (2019), *rev den*, 366 Or 382 (2020) (holding that the defendant did not invoke the right to counsel when he asked an officer, "Do I need a lawyer?"). Nevertheless, our case law suggests that the circumstances of invocation of the right to counsel may not be coextensive with the circumstances in which we must determine whether a defendant was denied a fair trial given witness testimony that a defendant exercised, or attempted to exercise, a constitutional right. *See State v. Swanson*, 293 Or App 562, 565 n 1, 429 P3d 732 (2018) (declining to "express an opinion on whether, even if the right [to counsel] had not attached, the *** testimony was nonetheless impermissible"); *see also State v. House*, 282 Or App 371, 375 n 3, 385 P3d 1099 (2016) (noting that in *State v. Schiller-Munneman*, 359 Or 808, 813, 377 P3d 554 (2016), the Supreme Court expressly left open the question of whether a defendant's invocation of the right to silence during police questioning could be admitted as substantive evidence at trial when the defendant was not in custody or compelling circumstances, and accepting parties' assumption that the state nonetheless was not permitted to draw attention to the defendant's silence). In this case, we assume without deciding that Biehler's testimony was a reference to which the latter analysis applies, whether or not defendant's question, as recounted by Biehler, constituted an "invocation" of the right to counsel. We consider whether Biehler's testimony led to a prejudicial inference about defendant exercising a constitutional right. In doing so, we may consider the particular wording recounted in the testimony to be relevant to the analysis.

[the] statement, the context in which that statement was introduced at trial, and the content or absence of any curative instruction." *State v. Swanson*, 293 Or App 562, 565-66, 429 P3d 732 (2018).

Evidence about a defendant's exercise of the constitutional right to counsel is generally inadmissible. A defendant is entitled to a mistrial where such evidence is adduced and the jury is likely to draw an inference that the defendant invoked the right to counsel because they were guilty, if a curative instruction could not remedy that under the circumstances. *State v. Schumacher*, 315 Or App 298, 301, 500 P3d 698 (2021). If the context does not make an inference of guilt likely, however, it is not an abuse of discretion for the trial court to deny a motion for a mistrial. *Veatch*, 223 Or App at 456.

On appeal, defendant argues that Biehler's testimony was highly prejudicial and that the jury would likely draw an inference of guilt given its context. Biehler noted that defendant had been relaxed and had not reacted with shock or defensiveness when she told him of the accusations, but that he "didn't have an answer for any of it." Defendant characterizes that testimony as "suggest[ing] that [he] was acting suspiciously" and argues that Biehler "confronted defendant with her knowledge that H's brothers had said they were not in and out of the room." Considering the context, defendant contends, the jury was likely to infer that defendant exercised his right to counsel because he was guilty.

The state argues in response that the context made it less likely for the jury to draw any unfavorable inference from Biehler's testimony about defendant's question. Specifically, defendant spoke with Biehler voluntarily and did not bring up the question about getting an attorney at a time or in a way that suggested he wanted to avoid answering questions. He asked the question at the conclusion of the conversation and, at that point, had consistently denied the allegations throughout the interview. In addition, Biehler was an ODHS caseworker completing a safety assessment for a child, not a police officer investigating a criminal offense.

Ultimately, we agree with the state that, in context, it was not likely that the jury would draw an inference of guilt from the reference to defendant's right to counsel. Defendant was at home on his front porch, talking to an ODHS case worker. She described him as relaxed, and he had consistently denied the allegations. He had not been contacted by police and police did not accompany Biehler. Defendant did not affirmatively assert the right to counsel to stop the interview or to obtain assistance in dealing with ODHS; rather, he asked Biehler's opinion about whether he should get an attorney. In context, one inference that could be drawn, which is consistent with both guilt and innocence, is that defendant asked the question to try to gauge whether Biehler believed him or not, and to get a sense of what he might expect to happen next.

Further, the context of the testimony about defendant's question did not make an inference of guilt more likely. In general, Biehler's testimony explained how H came to the agency's attention and the course of its investigation. H had already testified about disclosing the abuse to her mother and grandmother the day after it happened, and her brother and her mother also had already testified. Nothing about the trial context contributed to the likelihood that the jury would draw an inference of guilt from Biehler's testimony about defendant's question.

Finally, we consider the context and content of the curative instruction, which was given immediately after the jury returned, and which explained that it was "absolutely inappropriate" for the jury "to consider in any way" the testimony relating to defendant and "a request for counsel." The court expressly instructed the jury that a request for counsel "is not an indication of guilt or innocence" and that it "should not be used in any fashion." As the court explained that the jury "must disregard" the testimony, it commented, "I see you all nodding and understanding that instruction," suggesting that the court saw signs that the jury understood and acknowledged the principle that an exercise of the right to counsel must not be used to infer guilt. *See State v. Wright*, 323 Or 8, 12, 913 P2d 321 (1996) ("The trial judge is in the best position to assess the impact of the complained of

incident and to select the means (if any) necessary to correct any problem resulting from it.").

In sum, in the circumstances in which defendant mentioned getting a lawyer, and the circumstances in which Biehler mentioned it in her testimony, it was not likely that the jury would draw an inference that defendant inquired about getting a lawyer because he was guilty. And, the court striking the testimony and delivering a timely curative instruction was sufficient to protect defendant's right to a fair trial. The trial court did not abuse its discretion by denying the motion for a mistrial.

ADMISSION OF EXPERT TESTIMONY

The state moved *in limine* to admit expert testimony about offender manipulation strategies to explain the dynamics of the relationship between an abuser and a child. Specifically, the state planned to offer the testimony to explain delays in reporting and how the dynamics of the relationship between an offender and a child can affect how the child perceives the abuse, how they might disclose abuse, and how a child might come to "accommodate" abuse. The state relied chiefly on *State v. Williams*, 321 Or App 594, 517 P3d 308 (2022), in which we held that such testimony is admissible for those purposes.[2] After a hearing, the trial court ruled that the evidence would be admissible for those purposes. Before the expert was called as a witness, defendant objected to the testimony, and the trial court overruled the objection.

On appeal, defendant argues that the testimony was not relevant for the purposes the state identified because H did not delay reporting and because "the prior contacts were not clearly sexual in nature." The thrust of defendant's argument is that the purposes for which the expert testimony was admitted in *Williams* are not served in this case. That is, the state offered expert testimony on "grooming" in *Williams* to explain a years' long delay in reporting, and to explain why the victims in that case would have engaged

---

[2] At trial, the state noted that we had essentially already determined, in *Williams*, that the evidence was admissible scientific evidence and that the expert the state called at trial, Schumann, was qualified to testify as an expert. When Schumann testified as an expert in *Willams*, her last name was Satterwhite.

in the "bizarre" behavior of continuing to have a close relationship with the defendant despite ongoing sexual abuse. By contrast, defendant argues that the facts in this case are so different that there is nothing to explain—H did not delay reporting and her behavior in continuing to have a close relationship with defendant was not "bizarre" because the prior instances of touching that made her uncomfortable were not severe abuse.

The state responds that the testimony was relevant to explain various aspects of H's behavior, such as the way she disclosed the abuse and to whom, and how an offender's strategies of giving a child attention, gradually desensitizing the child to contact and sexual touch and to violating social norms and rules—such as providing the child with drugs—can discourage reporting. Schuman testified that people outside her field often do not understand how the grooming strategies and dynamics related to disclosure can intermingle, and they may have different expectations about how victims of abuse should act.

We review relevancy determinations under OEC 401 for errors of law and we review OEC 403 balancing for abuse of discretion. *Williams*, 321 Or App at 608.

The trial court admitted the evidence after concluding that it was relevant to "explain and contextualize disclosure behaviors, and it would be helpful to the jury on that issue including by providing possible explanations for the *** child's behavior and decision making process." The court noted specifically that the jury could view H as "acting counterintuitively" by "not immediately calling 9-1-1" when defendant was sexually abusing her or wonder why she did not tell anyone about defendant touching her thighs in ways that made her uncomfortable. The court elaborated that aspects of the way that H disclosed the abuse could lead to an inference that the abuse did not occur, and the evidence at issue could provide the alternative explanation that she was "responding to a particular victim offender dynamic." The court also expressly ruled that the evidence was not admissible to show that defendant engaged in grooming conduct and therefore must be a sexual offender.

In *State v. Henley*, 310 Or App 813, 822-24, 486 P3d 853, *rev den*, 368 Or 496 (2021), we held that it was not error to admit evidence "to explain the potential significance of some of [the] defendant's behavior," and not to establish that the defendant had groomed the victim and therefore had sexually abused her. Defendant argues essentially that the evidence about offender manipulation strategies and disclosure dynamics was inadmissible here because H's behavior was not so "bizarre" that it required explanation. We disagree with that formulation. Such evidence can help to explain behavior that would be counterintuitive in practically any other context. Although H disclosed the abuse to multiple people in her life quickly, she did not report it to police or child welfare. When someone else reported the abuse to child welfare anonymously and the agency contacted her, H was worried that she might be removed from her mother's home if she disclosed that defendant had provided her with marijuana. An understanding of the dynamics could also help to explain not only why H did not contact law enforcement, but also why she did not leave when defendant was sexually abusing her in her room. It might be viewed as counterintuitive that she took incremental steps to try to frustrate his ability to abuse her—first covering her lower body with a blanket, then putting on sweatpants—rather than taking more drastic steps. The evidence at issue was relevant to evaluating the victim's behavior.

To the extent that defendant challenges the scientific validity of the evidence at issue, we have already decided that issue, and we are not persuaded that there is any meaningful difference between the cases establishing that and this case. *Henley*, 310 Or App at 822-24; *Williams*, 321 Or App at 620-21; *State v. Perry*, 347 Or 110, 121-26, 218 P3d 95 (2009).

Finally, defendant argues that the offender manipulation and disclosure dynamics evidence should have been excluded under OEC 403. OEC 403 requires that evidence be excluded if the probative value of the evidence is substantially outweighed by the danger of unfair prejudice. We review the trial court's OEC 403 ruling for abuse of discretion.

We conclude that the trial court acted within its discretion when it admitted the evidence. The evidence had substantial probative value because it could suggest an explanation and context for some of the events at issue, including the dynamics of the relationship between defendant and H and how those dynamics might affect H's behavior, including not calling law enforcement when she was being abused and the abuser left the room. At the same time, the danger of unfair prejudice was low because the trial court limited the testimony to general aspects of the grooming process, as described in the literature, and there was no opinion testimony about either defendant's or H's behavior in this case. In addition, the trial court offered to provide a limiting instruction if defendant wanted one.

The trial court did not abuse its discretion when it ruled that the scientific evidence was admissible under OEC 403.

## CONCLUSION

The trial court did not err by denying defendant's motion for a mistrial, or by admitting expert testimony about offender manipulation strategies and disclosure dynamics, or "grooming" evidence. Accordingly, we affirm the trial court's judgment.

Affirmed.