HADLOCK, J.
*602 *32 After defendant's niece, D, alleged that defendant had sexually abused her when she was a child, detectives interviewed defendant at a sheriff's office. During that interview, defendant mainly described a supportive, fatherly relationship with D and denied the allegations of sexual contact. However, he also made some inculpatory statements. Defendant eventually was charged with 46 counts of sexual abuse, rape, sodomy, and unlawful sexual penetration. He unsuccessfully moved to suppress the statements he made during the interview on the ground that he had invoked his constitutional right to counsel and detectives had not honored that invocation. At trial, the statements that defendant had sought to suppress were admitted into evidence. Defendant was convicted of five of the counts charged: four counts of first-degree sexual abuse and one count of second-degree unlawful sexual penetration. On appeal, defendant assigns error to the denial of his suppression motion. As explained below, we agree that the trial court committed reversible error when it denied that motion. Accordingly, we reverse and remand.[1]
To give context for our description of the facts, we set out foundational principles governing the right to counsel during custodial interrogation. Article I, section 12, of the Oregon Constitution states that "[n]o person shall *** be compelled in any criminal prosecution to testify against himself." The right to counsel during custodial interrogation derives from that right against self-incrimination. State v. Roberts , 291 Or. App. 124, 131, 418 P.3d 41 (2018). The right attaches only when a person is in custody or other compelling circumstances. That is, when a person is not in custody or compelling circumstances, officers may continue interrogating that person even after he or she expresses a desire to contact an attorney, so long as the officers do so in a way that does not render the person's responses involuntary. State v. Anderson , 285 Or. App. 355, 357, 396 P.3d 984, rev. den. , 362 Or. 94, 405 P.3d 154 (2017). However, when a person is *33 in custody or compelling circumstances and unequivocally invokes the right to counsel, interrogation must cease. State v. Sanelle , 287 Or. App. 611, 623, 404 P.3d 992 (2017), rev. den. , 362 Or. 482, 412 P.3d 199 (2018). If the person invokes the right to counsel only equivocally, officers may ask clarifying questions, but those questions must be aimed at clarifying whether the person intended to invoke that specific right. Id . at 627, 404 P.3d 992.
We turn to the facts of this case. In reviewing the trial court's denial of defendant's suppression motion, we are bound by the trial court's findings of historical fact so long as evidence in the record supports them. Roberts , 291 Or. App. at 129, 418 P.3d 41. Except for reference to a few undisputed facts described at trial, which we include only to provide background, we "limit our analysis to the record developed at the motion hearing." Id . We summarize the pertinent facts in accordance with that standard.
As noted, defendant is D's uncle. When D was a young child, she moved out of her parent's home and went to live with her grandmother, with whom defendant (the grandmother's son) also lived. Defendant, D, and D's grandmother lived together for the next few years, until defendant got married and moved away.
Several years later, D disclosed to her mother that defendant had sexually abused her when they lived together, beginning when she was about eight or 10 years old. D's mother reported the abuse, and a detective was assigned to investigate. Defendant voluntarily went to a sheriff's office to speak with detectives because he had been told that he "might be a potential witness in a case they were investigating." He thought that detectives were going to question him about what he suspected was drug activity at his neighbor's house. Defendant was taken to an interview room on an upper floor at the sheriff's office via a locked elevator and through a locked door. Because of the locks, *603 he could not have left entirely on his own; somebody from the office would have had to escort him out.
Defendant was seated at a table in the interview room, along with two detectives, one of whom-Brulew-asked most of the questions during the interview. The entire interview was video-recorded. The detectives were in plain *34 clothes and the tone of their questions was conversational. Brulew thanked defendant for coming in, informed him that the interview was being recorded, and asked some preliminary questions. Brulew then reiterated, as he had "explained on the phone, [that defendant was] not under arrest" and that Brulew had "no intention of arresting [defendant] today at all," short of defendant admitting that he had killed somebody. Brulew told defendant that he was free to decline to answer questions and could leave at any time:
"So you saw how we came in and out. You just have to kind of go through that hallway. And we're [going to] have some questions and answers, and it's not an all or nothing thing. You can answer what you want. You can, not answer what you want. Questions get uncomfortable you say, hey, I wanna-I wanna stop talking, I'll say, great to meet you, [defendant]. I'll walk you out to the lobby and we'll be good today, okay. It's not an all or nothing thing."
Brulew then read defendant his Miranda rights, but explained that having his rights read did not mean that defendant was under arrest:
"Um, but since you're in a police station I just want to read you your rights, ok, but again you're not under arrest by any stretch of the imagination. You do have a right to remain silent. Anything you say can be used against you in the court of law. You have the right to consult a lawyer before any questioning or have a lawyer present during questioning. If you desire a lawyer and cannot afford one a lawyer will be appointed for you at public expense. And anything you say must be freely and voluntarily said."
Brulew asked defendant if he understood those rights, and defendant answered affirmatively. Defendant also responded affirmatively when Brulew asked whether defendant was still willing to talk with him. Brulew then reiterated that "it's not all or nothing, so as we go along, you holler, we'll be out of here."
Brulew then asked defendant about the time when he, his mother, and D lived together. Defendant said that D moved in with them because of "the messed up circumstance" at her parents' house, which reportedly involved D's parents treating her differently from her siblings. Defendant said that he "watched [D] a lot" while his mother went to work *35 and that he was probably the closest thing to a father that D had ever known. Brulew told defendant that D had reported being physically abused by defendant's mother. Defendant acknowledged that he had seen his mother "just kind of like grabbing, and shaking, and maybe yelling," but he denied having seen her hit D. Discussion followed about whether D might have exaggerated any of the allegations against her grandmother.
At that point, Brulew told defendant that he had been very honest with defendant and had "no intention of lying to [defendant] or trying to fake [him] out or anything like that." Brulew also said that he hoped that defendant was honest, too, and that defendant would "tell [Brulew] the truth and everything." Brulew then told defendant that D had alleged that defendant "inappropriately touched her." Defendant denied that he had ever touched D in other than an affectionate, fatherly way. Brulew asked if D might have had a crush on defendant or might have misinterpreted an appropriate touch as inappropriate. Defendant responded that he could not think of a time when that could have happened. In response to a question about whether he had ever "been naked with" D, defendant said he had not, but acknowledged that D had seen him naked "by accident" a few times, when she walked into the bathroom or bedroom unannounced.
As the interview continued, Brulew told defendant about specific incidents that D had described, including defendant having touched her breast while they played video games. Defendant said that he did not remember that incident, but "[i]f that happened, *604 it was purely by accident." Brulew told defendant that D was making "very specific" allegations of a type that, in Brulew's experience, are "not something that kids usually make up." Accordingly, Brulew said, he wanted to "make sure that the whole picture gets out there and so that we fully understand how it happened, um, instead of just taking one side of it." Brulew said that he was concerned that "something did occur and that, you know, the way that [defendant] saw it is different than the way that [D] saw it." Defendant said he could not recall any such incidents, but also suggested that there were times "where [D] was thinking of [defendant] as more romantically than *36 as an uncle." Questions and answers about D's interest in sexuality and the nature of her relationship with defendant continued for the next several minutes, with defendant reiterating that he and D were close, that he "tried to always be there for her," and that he could not remember anything happening that somebody could view as inappropriate.
The questioning eventually turned to more specific allegations that D had made, with Brulew saying that he and the other detective were there "to hear [defendant's] side of events so that we can make sure that no one just reads her version and paints their own picture of you and thinks that you're some sort of evil, horrible, person." Brulew suggested that it might be painful and difficult for defendant to think about the events because, "looking back on it you think well, maybe-maybe that was a little too far. But at the time it was filling a need that [D] needed, and that you needed, and it was done in a loving way." Defendant again denied abuse but he acknowledged then, and later in the interview, that he had open discussions with D about sex; he "wanted to be the one in her life that was always honest with her and never lied to her."
Brulew then asked whether D ever requested to see defendant's penis, and defendant said that she might have. Defendant denied ever having showed D his penis, but said that he knew that D saw him naked more than once as she ran around and entered rooms with closed doors. Brulew then asked defendant about a specific event, prompting defendant to reference the need for a lawyer:
"Q: Okay. Um, there's a-an incident where, um, your mom had gone to bed, you were both in *** your bedroom and the lights were actually off and you got undressed by yourself, and you were completely naked, and you laid down on the bed, on your back, and you pulled her *** close to you so she was along your side, kind of like cuddling. And that then after that occurred for a few minutes you took her hand and you guided it to your penis where you then showed her how to rub it up and down to give yourself an erection. And then after masturbating, you ejaculated.
"A: Sounds like I need a lawyer , 'cause that never happened.
"Q: Okay.
*37 "A: 'Cause that's - wow. Really? That's mind boggling, 'cause that never happened.
"Q: Okay, And I mean, it goes on from there?
"A: I can't imagine. No, that would be totally inappropriate. I would never do that.
"Q: Okay. Would you like to go, keep discussing this?
"A: Without a lawyer here, I don't know . So there's more?
"Q: Mm-hm.
"A: What else?"
(Emphases added.)
At that point, Brulew emphasized that he had only D's statements about what happened and that it was the detectives' job "to help bring the complete truth forward." After describing more alleged incidents of abuse, which defendant vehemently denied, the following exchange occurred:
"A: I don't know why [D] would maybe embellish situations when we were together to like, that extent, but it didn't happen...
"Q: Okay.
"A: ... you know. There may have been a time when I think I got aroused and she was curious what happened and I was *605 like - I was like, no. But I kept my clothes on, you know.
"Q: Mm-hm.
"A: And I explained to her, well, go away. We're getting too close or something, but it never - it never - none of that ever happened."
On further questioning, defendant acknowledged that he did "think there was a time" when he became aroused when D was present and "we were maybe close and - and the - you know. But, you know, that was it, you know. I kept my pants on always." Defendant later suggested that may have happened after he had been watching a pornographic movie or when he and D had been wrestling and she rubbed up against him. After further discussion, including about whether charges would be brought against him, the interview ended *38 and one of the detectives walked defendant out so he could leave.
As noted, defendant was later indicted on 46 counts of sexual abuse, rape, sodomy, and unlawful sexual penetration based on D's allegations. Defendant filed a pretrial motion to suppress the statements that he made during the interview after he referenced wanting an attorney. Defendant asserted that those statements "were obtained in violation of [his] invocation of his right to counsel by the detectives' blatantly ignoring his invocation and continuing to question him." Defendant also cited cases for the propositions that Miranda warnings are required under the Oregon Constitution when a person is in custody or in compelling circumstances and that police must stop interrogating a suspect when that person is "in police custody" and unequivocally invokes his right to counsel. Although, defendant did not directly assert that he was in custody or compelling circumstances when he was questioned at the sheriff's office, his suppression motion was implicitly premised on that having been true.
At a hearing on the motion, defendant acknowledged that he had been read his Miranda rights. He also acknowledged that a detective had told him that, if he was uncomfortable with any of the questions, he could "just holler, and we are out of here." Defendant testified that he had interpreted the statement to mean that the interview would be over any time that he said "I'm done" or "I would like to talk to a lawyer." Defendant testified that he "felt intimidated" during a silence that followed his statement that he did not know whether he wanted to keep talking without a lawyer present. Defendant asserted that the detectives glared at him during the pause and he "felt like at that moment, if [he] didn't continue or something, that it would just be worse, that [he] felt like [he] had to continue, because they didn't-I was waiting for them to say, 'Okay, we are done,' and they didn't do it."
In response, the state argued that defendant's request for a lawyer was equivocal and that detectives asked permissible clarifying questions before continuing the interview. The state did not argue that defendant had not *39 been in custody or compelling circumstances while he was questioned and there was no discussion on that point at the hearing. The court ultimately denied defendant's suppression motion on the grounds that defendant had made only "an equivocal request to talk to a lawyer" and that officers had engaged in permissible "questioning [that] did intend to clarify [defendant's] intent."
On appeal, defendant first contends that he unequivocally invoked his right to counsel when he stated, "Sounds like I need a lawyer, 'cause that never happened," and interrogation therefore should have immediately ceased. In the alternative, defendant argues that he at least equivocally invoked his right to counsel and that the detectives did not ask permissible clarifying questions "but instead launched into a full discussion of the case making statements designed to induce defendant to talk." Accordingly, defendant contends, "the trial court erred in denying [his] motion to suppress."
In response, the state argues that defendant did not unequivocally invoke his right to counsel. Moreover, the state contends, defendant did not preserve an argument that he made an equivocal invocation and, therefore, we "should limit [ourselves] to addressing defendant's unequivocal-invocation claim." As explained below, we reject the state's preservation argument, and we agree with defendant that he at least equivocally invoked his right to counsel.
*606 We start with preservation. Although defendant's written suppression motion was not premised on an assertion that he had equivocally invoked his right to counsel, the trial court raised that issue at the hearing. A colloquy ensued, mainly between the court and the prosecutor, that focused on whether defendant had equivocally invoked and, if so, whether the detectives had asked permissible clarifying questions. The prosecutor argued expressly that "the invocation, if that's what you want to call it, was equivocal" and that, after the detectives had "asked further questions to see if he wanted a lawyer, [defendant] said he just wanted to talk to them," meaning that no constitutional violation occurred. Those circumstances are much like those that we addressed in Roberts , in which the trial court also "raised *40 the equivocal invocation issue sua sponte " and the defendant "never took an explicit position on that issue below." 291 Or. App. at 129, 418 P.3d 41. There, we held that the equivocal-invocation issue was adequately preserved for appeal because, despite the defendant's failure to raise that issue, it "was clearly raised and ruled upon, * * * the [prosecutor] had an opportunity to be heard on the issue, and * * * there is no reason to believe that the record before the trial court would have developed materially differently if the [defendant] had been more vocal." Id . at 131, 418 P.3d 41. The same is true here.
We turn to the merits. A suspect equivocally invokes the Article I, section 12, right to counsel "when the suspect's statement or request is subject to more than one reasonable interpretation, one of which is that he or she is invoking the right to counsel." Id . at 132, 418 P.3d 41. "A statement that appears tenuous or equivocal in isolation may be a sufficient request for counsel when evaluated in the context of all of the circumstances." Sanelle , 287 Or. App. at 624, 404 P.3d 992 (internal quotation marks omitted). The question is whether a reasonable officer would have understood "at least one plausible meaning" of the suspect's statement or question "to be that defendant was invoking the right to counsel." Roberts , 291 Or. App. at 133, 418 P.3d 41 (emphases in original).
Here, we readily conclude that defendant at least equivocally invoked his right to counsel.[2] A reasonable officer would have understood that the statement "Sounds like I need a lawyer" could indicate defendant's present assertion of the desire for an attorney. See id . at 133-34, 418 P.3d 41 (citing cases that focus on an expression of a present desire for counsel). If considered alone, the words "I need a lawyer" could not be more clear. Cf. State v. Acremant , 338 Or. 302, 322, 108 P.3d 1139, cert. den. , 546 U.S. 864, 126 S.Ct. 150, 163 L.Ed.2d 148 (2005) (the defendant's statement, "I think that I do need a lawyer. I do," unequivocally expressed his desire for counsel). And even assuming that *41 the prefatory words "[s]ounds like" made defendant's request equivocal, a reasonable officer still would have understood that defendant might be invoking his right to counsel. The context in which defendant made that statement would have reinforced that understanding, as the statement immediately followed Brulew's graphic description of D's allegations of abuse, indicating defendant's desire not to discuss serious criminal accusations against him without a lawyer's assistance. Cf. State v. Nichols , 361 Or. 101, 111, 390 P.3d 1001 (2017) (timing of the defendant's statement, "It's not something I want to talk about," indicated an invocation of the right against compelled self-incrimination because it followed a question that "went to the core of the entire investigation"). Thus, defendant at least equivocally invoked his right to counsel.
Following an equivocal invocation, the detectives had two choices. They could either stop their interrogation of defendant or ask him "neutral follow-up questions intended to clarify the equivocal nature of defendant's statement."
*607 State v. Hickman , 289 Or. App. 602, 606-07, 410 P.3d 1102 (2017). "Any questioning not reasonably designed to clarify the equivocal nature of the statement is impermissible." State v. Schrepfer , 288 Or. App. 429, 436, 406 P.3d 1098 (2017). Here, detectives did neither. Rather, Brulew said only, "Okay" and then, after defendant asserted "that never happened," Brulew suggested "it goes on from there?" before asking whether defendant would like to "keep discussing this?"
The state argues that Brulew's latter question was a permissible response "to defendant's ambiguous reference to counsel" because it sought to clarify that ambiguity. We have rejected similar arguments in recent cases, emphasizing that "[t]he clarification that officers must obtain is whether a suspect intended to invoke the right to counsel derived from the right against self-incrimination under Article I, section 12." Sanelle , 287 Or. App. at 627, 404 P.3d 992 ; see also Roberts , 291 Or. App. at 133, 418 P.3d 41 ("Any question not reasonably designed to clarify the equivocal nature of the statement is impermissible."). In other words, any questioning that follows an equivocal invocation of the Article I, section 12, right to counsel must clarify whether the suspect is invoking that right to counsel .
*42 Clarification of any other right-such as the right against compelled self-incrimination or the right to court-appointed counsel under Article I, section 10-is insufficient. Sanelle , 287 Or. App. at 627, 404 P.3d 992. Thus, when a suspect invokes the right to have an attorney present during custodial interrogation, an officer may not simply ask whether the suspect wishes to keep talking, without also clarifying that the suspect has "a right to have a lawyer assist him during the interview." Id . at 628, 404 P.3d 992. To the contrary, by asking a suspect whether he wishes to keep talking after he has invoked the right to counsel, officers at least deflect that invocation and risk suggesting to the suspect either that he does not have such a right or that the right will not be honored. Here, the detectives did not ask permissible clarifying questions after defendant equivocally invoked his right to counsel, but instead continued the interview.
The state also argues that we can nonetheless affirm the trial court's denial of defendant's suppression motion because, even if he had invoked his right to counsel, he subsequently waived that right. Such a waiver occurs when a suspect "initiate[s] conversation with the officers by making unprompted statements that indicate[ ] a willingness to have a generalized discussion regarding the substance of the charges or investigation." Hickman , 289 Or. App. at 607, 410 P.3d 1102 (emphasis added). The state bears the burden of showing that the suspect's waiver was knowing, intelligent, and voluntary. Id . In determining whether a suspect's initiation of conversation indicates a valid waiver under such circumstances, we consider factors like "the nature of the initial [invocation and] violation, the amount of time between the violation and the [suspect's] later statements, whether the [suspect] remained in custody between the violation and the later statements, and whether there was a change in time and circumstances." State v. McAnulty , 356 Or. 432, 457-58, 338 P.3d 653 (2014), cert. den. , --- U.S. ----, 136 S. Ct. 34, 193 L.Ed.2d 48 (2015). Here, the state argues that defendant validly waived his right to counsel when he continued conversing with detectives after they asked whether he wanted to "keep discussing this," even though he responded, "Without a lawyer here, I don't know." That is because, according to the state, defendant clearly understood that he had a right to counsel *43 and yet he immediately asked "So there's more?" after indicating that he was uncertain about continuing the interview without a lawyer.
We disagree that the circumstances demonstrate a valid waiver. Defendant's continuation of the interview immediately followed the detectives having failed to honor his invocation of the right to counsel and, instead, having asked whether he wanted to keep talking. Thus, defendant's continued interaction with the detectives cannot be considered "unprompted." Moreover, there was neither a break in time following the detectives' disregard of defendant's invocation, nor did the circumstances change in any way that demonstrates a general willingness by defendant to discuss the accusations against him. See *608 Hickman , 289 Or. App. at 608, 410 P.3d 1102 (no waiver when there "was neither a break in time nor a change in circumstance, and defendant's incriminating statements were prompted by [an officer's] continued impermissible interrogation"). We therefore reject the state's assertion that defendant waived his previously invoked right to counsel.
The state's final argument is that we should affirm denial of the suppression motion on a "right for the wrong reason" basis because defendant was not in custody or compelling circumstances during the interview and, therefore, his Article I, section 12, right to counsel had not attached. The state contends that defendant was not in compelling circumstances because it was undisputed that he voluntarily went to the sheriff's office and was clearly told that he could terminate the interview and leave at any time. The state asserts that we can properly affirm the trial court's ruling on that alternative basis under Outdoor Media Dimensions Inc. v. State of Oregon , 331 Or. 634, 659-60, 20 P.3d 180 (2001), because the record would not have developed differently had the "compelling circumstances" question been raised below, given that a recording of the entire interview with defendant was admitted at the suppression hearing.
Defendant disagrees, asserting in a reply brief that the record might have developed differently had the state "wanted to seriously contest defendant's custody status." In a memorandum of additional authorities, defendant also *44 argues that-if we do reach the "compelling circumstances" argument-we should conclude that the circumstances during defendant's interview "were at least as compelling" as those we addressed in State v. Grimm , 290 Or. App. 173, 184, 414 P.3d 435, rev. den. , 363 Or. 283, 432 P.3d 1076 (2018) (holding that an interview at a police station became compelling, despite the defendant having gone there voluntarily, when officers went beyond simply confronting the defendant with incriminating evidence and instead asked coercive questions "calculated to contradict defendant's repeated assertions of innocence and pressure him to continue talking"). The state has not filed a response to that memorandum.
We decline to consider the state's belated argument that defendant was not in compelling circumstances during his interview at the sheriff's office, (even assuming that the record would not have developed differently had the state made that argument below). As presented in this case, the "compelling circumstances" issue has nuances that the parties' appellate filings do not address. For example, although the circumstances during defendant's interview can be analogized to those that we held were "compelling" in Grimm , a distinction is that the Grimm defendant was not given Miranda warnings, 290 Or. App. at 174, 290 Or.App. 173, and the defendant in this case was. In this context, did the initial giving of Miranda warnings make the circumstances less compelling because defendant was informed of his right to counsel? Cf. State v. Turnidge , 359 Or. 364, 404 n. 24, 374 P.3d 853 (2016), cert. den. , --- U.S. ----, 137 S. Ct. 665, 196 L.Ed.2d 554 (2017). ("The reading of Miranda rights is a factor that weighs in favor of concluding that a defendant subject to police interrogation understands his or her ability to terminate questioning and to otherwise seek counsel rather than cooperate with law enforcement."). Or. did the circumstances become more compelling because, even though defendant was informed of his right to counsel, his later attempt to invoke that right was not honored? Cf. State v. Sparklin , 296 Or. 85, 89, 672 P.2d 1182 (1983) ("[w]hen the police honor" a defendant's invocation of the right to counsel during interrogation, "the coercive atmosphere of police interrogation is to some degree dispelled"); State v. Koch , 267 Or. App. 322, 332, 341 P.3d 112 (2014) (when officers continued questioning the defendant *45 following an unequivocal invocation of the right to counsel, they likely created the impression that assertion of the right was meaningless). On a related note, did the detectives' specific questions to defendant create escalating pressure over time so that the circumstances became compelling by the time defendant made incriminating statements?
The parties' discussions of the "compelling circumstances" issue are brief and do not meaningfully address the kinds of questions *609 we have posed above. Indeed, the state's argument focuses entirely on the circumstances that existed at the beginning of the interview, when defendant was read his Miranda rights and informed that he could end the interview at any time, and does not grapple with the question whether the circumstances became compelling at a later point. Any appellate resolution of that question could have significant implications for future cases as well as for law-enforcement practices. Furthermore, although the "compelling circumstances" question is a legal one, litigation of the issue in the trial court would have given us additional information to consider on appeal, possibly including a developed explanation of the parties' positions and the trial court's reasoning, all of which would be helpful to an analysis on appeal, even if the evidentiary record itself would not have changed. For all of those reasons, we decline to exercise our discretion to address the question in this case. See State v. Friddle , 281 Or. App. 130, 142 & n. 9, 381 P.3d 979 (2016) (declining to address alternative basis for affirmance, raised for the first time on appeal, for similar reasons; citing additional cases taking that approach).
Finally, we briefly address the state's contention that any error in denying defendant's suppression motion was harmless. We disagree. After the court denied defendant's suppression motion, the case went to trial before a jury. D testified about her close relationship with defendant and several times when he sexually abused her. Defendant did not testify, but the recording of his interview at the sheriff's office was played for the jury, which included defendant's repeated post-invocation acknowledgements that he had become aroused around D when they were together. Much of the other evidence at trial focused on D's credibility generally, the credibility of her accusations against defendant *46 (both as made in out-of-court statements and as delivered during her trial testimony), and reasons she may have had for being upset with defendant. A description of that evidence would not benefit the bench or bar. However, having reviewed that evidence, we conclude that defendant's own video-recorded description of his close relationship with D could have influenced the jury's deliberations, and we cannot say that there is only "little likelihood" that defendant's post-invocation statements affected the verdict. State v. Davis , 336 Or. 19, 32, 77 P.3d 1111 (2003) (stating that standard for harmless error).
Reversed and remanded.

Our resolution of defendant's challenge to denial of the suppression motion obviates the need for us to address the other two assignments of error that he raises on appeal, which address issues that may not arise on remand.

Because we can resolve this appeal on the ground that defendant at least equivocally invoked his Article I, section 12, right to counsel, we need not address whether his invocation could properly be understood as having been unequivocal. This opinion expresses no view on that question. For the same reason, we need not-and do not-address defendant's contention that suppression was required because the detectives violated his rights under the Fifth Amendment to the United States Constitution.