Argued and submitted July 16, reversed and remanded October 21, 2020

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## ERICK JOAQUIN,
*Defendant-Appellant.*

Lane County Circuit Court
16CR70691; A167411

476 P3d 1263

Defendant appeals from a judgment of conviction for murder constituting domestic violence, assigning error to the trial court's denial of his motion to suppress evidence that he contends resulted from police interrogation that violated his right to counsel under Article I, section 12, of the Oregon Constitution. Defendant argues that he unequivocally requested counsel but that, even if his request was equivocal, the detective's subsequent questions went beyond statements designed to clarify whether defendant intended to invoke his right to counsel. He further contends that his consent to a search of his apartment, phone, and person were the product of that illegality, such that all of the later-discovered evidence must be suppressed. *Held*: Defendant's request for counsel during his initial police interview required, at the very least, additional clarifying questions from the detectives before the interrogation continued. The inculpatory statements and physical evidence defendant sought to suppress—with the notable exception of physical evidence discovered during execution of a search warrant—derived from the illegality and should have been suppressed.

Reversed and remanded.

Jay A. McAlpin, Judge.

Kristin A. Carveth, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Shannon T. Reel, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Lagesen, Presiding Judge, and James, Judge, and Kamins, Judge.

KAMINS, J.

Reversed and remanded.

**KAMINS, J.**

Defendant appeals from a judgment of conviction for murder constituting domestic violence, assigning error to the trial court's denial of his motion to suppress evidence that he contends resulted from police interrogation that violated his right to counsel under Article I, section 12, of the Oregon Constitution. For the reasons explained below, we agree with defendant that his request for counsel during his initial police interview required, at the very least, additional clarifying questions from the detectives before the interrogation continued. We further agree with defendant that the inculpatory statements and physical evidence he sought to suppress—with the notable exception of physical evidence discovered during execution of a search warrant—was derived from the illegality and should have been suppressed. We therefore reverse and remand for a new trial.

## I.   BACKGROUND

The pertinent facts are undisputed for purposes of this appeal. Defendant and Yucupicio-Pizano worked as roofers and lived on property owned by the roofing company's general manager, Mohon. Yucupicio-Pizano lived in a trailer, and defendant lived in a detached apartment. On November 5, 2016, police responded to a 9-1-1 call from Mohon in which he reported that Yucupicio-Pizano told him that defendant had killed someone and that the floor of defendant's apartment was torn up; upon arrival, police entered the apartment and found what they believed to be a decomposing body in a blanket under a mound of dirt below the floorboards. Defendant was arrested later that day at his construction site by Officer Cooper, who read defendant his *Miranda* rights. Defendant was then taken to the police station, where he was placed in a holding cell for a "couple of hours."

Detectives Hall and Roth arrived to interview defendant. Before the interview started, Cooper told the detectives that, when he had arrested defendant and read him his *Miranda* rights, defendant had told Cooper, "I want to discuss with my mom so I can—I can get my own attorney." Cooper also told the detectives that defendant had been speaking in Spanish with a coworker at the job site and had

asked the coworker to call defendant's mom. Cooper said, "I didn't know what the statement was but I could tell that it was something to do [with] an attorney. Abogado is the last thing he said."

Based on that information, Roth acknowledged that "abogado" means attorney and that they "[g]otta have him clarify" before starting the interview. Hall then woke up defendant, who had been asleep in the holding cell. Hall did not re-*Mirandize* defendant at that point. Rather, Hall explained that he and Roth wanted to talk with defendant upstairs, so that defendant "can explain what's going on and help us figure some stuff out." Defendant and Hall then had the following exchange:

"[DEFENDANT]:   Um, is there a judge present?

"[HALL]:   A judge? No, there's no judges present. It's just gonna be . . .

"[DEFENDANT]:   Oh.

"[HALL]:   . . . me and you  . . .

"[DEFENDANT]:   A lawyer?

"[HALL]:   A lawyer—is there one? Nope, there's no lawyers here.

"[DEFENDANT]:   Can we wait 'till one's present?

"[HALL]:   We can always wait 'till one's present if that what you wanna do? Is that what you wanna do?

"[DEFENDANT]:   Umm

"[HALL]:   I wasn't there. I know those officers explained your rights to you before so I wanna make sure that you do understand your rights and if you talk to me and if you do so it's voluntary and I'd appreciate it if [you] would, but it's completely up to you to talk without one or with one so that's—that's your choice. I can't make that for you. You let me know and if you wanna talk now we'll go talk. If you wanna wait for a lawyer—we'll wait for a lawyer. That's up—it's your choice—your call. I know you're just waking up so I don't wanna start asking you a bunch of serious questions when you're still groggy. So we can even start talking and then if you wanna stop at any point you can let me know and we can stop talking too. So, those are kinda your options."

At that point, defendant responded, "Oh yeah. Can you get me out of these clothes soon?" The conversation then shifted to how badly defendant wanted to get out of his wet clothes and warm up, and the police provided him with a dry shirt and pair of pants.

Defendant was eventually taken upstairs for the interview, where he confessed to killing his girlfriend, J, but claimed that she had attacked him. At the end of the interview, Hall sought and received consent from defendant to search his apartment, photograph him, take fingernail scrapings, inspect the contents of his phone, and take DNA swabs from him.

The following day, police obtained a search warrant for the apartment. The affidavit in support of the warrant was based on facts known to police from their initial entry into the apartment, their discussions with Mohon and Yucupicio-Pizano, their interview with defendant, and other investigation of defendant and J and their relationship. That search yielded, among other evidence, the victim's body, a trash bag hidden under the floor that included bloody cargo pants, a blood-stained shirt, a rain coat, and a bent knife blade.

Meanwhile, defendant had been held overnight and was then interviewed the next day after police had executed the search warrant. Before the second interview, Hall read defendant his *Miranda* rights. The second interview was "more confrontational," as Hall pressed defendant on "facts that didn't quite add up from his previous statement." During the second interview, defendant admitted that J had not attacked him, that the story had just "come into [his] head," and that he had stabbed J, saw her suffering, and then wanted to end that suffering.

Defendant was charged with one count of murder constituting domestic violence, ORS 163.115; ORS 132.586. Before trial, he filed two motions to suppress. Although only the denial of the second is directly challenged on appeal, we discuss both because the first informs our analysis of the scope of suppression.

Defendant's first motion challenged the warrantless search that occurred when police responded to Mohon's

9-1-1 call and entered the apartment. Defendant sought to suppress any evidence obtained as a result of that search, "including the observation and subsequent seizure of items located under the floor of that residence and the seizure of any and all derivative evidence, including any evidence seized by a subsequently obtained search warrant and all oral derivative evidence."

The second motion sought to suppress "all statements made by Defendant on the grounds that they were illegally obtain[ed] because the Defendant invoked his right to counsel, involuntary, and on the ground that any waiver of *Miranda* rights was not intelligently given, and suppressing all derivative evidence illegally obtained as fruit of the poisonous tree." Defendant explained that the derivative evidence included evidence obtained from the search of his apartment, the contents of his phone, photographs of his person, collection of his fingernail scrapings, and his DNA. Defendant acknowledged that the state eventually obtained a search warrant for the apartment but stated that "the warrant is based on evidence obtained from the illegal search."

The trial court denied both motions to suppress. With regard to the warrantless search of the apartment, the court ruled that Mohon's consent to the search was sufficient and that the emergency aid exception applied to the officers' warrantless entry based on the report that someone had been stabbed. The court also reasoned that, even if police should have realized that the victim was deceased rather than in need of emergency assistance after they entered the apartment, the officers had enough information to obtain a search warrant for the apartment and inevitably would have discovered the evidence found there.

With regard to defendant's second motion, the trial court concluded, in relevant part, that defendant's question—"Can we wait 'till [a lawyer's] present?"—was an equivocal invocation of his right to counsel but that "Detective Hall did what he is required to do, which is let [defendant] know what his constitutional rights were and let him know that they would, in fact, wait for an attorney if that's what [defendant] wanted. And then [defendant] proceeded to continue to talk." The trial court acknowledged that the

detectives were not neutral parties and wanted defendant to continue talking. Nonetheless, the court concluded that the law did not require anything more than to let defendant know his rights and "where he stands as an individual under the laws of the United States and the State of Oregon, and let [defendant] make his own decision, and that's what happened."

Defendant proceeded to trial, where the state introduced the evidence he sought to suppress, including police observations upon their initial entry, defendant's statements confessing to the murder, the contents of the bag discovered in the apartment, and DNA evidence linking him to bloody clothing. A jury found him guilty and he was convicted of murder constituting domestic violence.

## II.   DISCUSSION

On appeal, defendant assigns error to the trial court's denial of his second motion to suppress, arguing (1) that defendant unequivocally requested counsel when he asked, "Can we wait 'till one's present?" and that all interrogation should have ceased at that point; and (2) even if the request was equivocal, Hall's subsequent questions went beyond statements designed to clarify whether defendant intended to invoke his right to counsel. Defendant further contends that he consented to a search of his apartment and of his phone and provided a DNA sample and fingernail scrapings after police had ignored his invocation of the right to counsel and during the course of the unlawful interrogation, such that all of the later-discovered evidence must be suppressed.

The state defends the trial court's ruling that defendant's request was equivocal and that Hall followed up with appropriate clarifying questions. Alternatively, the state argues that we should affirm, even if defendant's right to counsel was violated, because: (1) his consent to searches of his apartment, phone, and person were nonetheless valid; (2) defendant does not challenge the court's ruling denying the first motion to suppress and does not "distinguish what evidence he contends was discovered pursuant to the alleged illegality"; and (3) any error in failing to suppress

defendant's statements was harmless in light of the state's other strong evidence of his guilt.

We begin by considering whether defendant's right to counsel was violated and then turn to questions concerning the consequences of that violation. We review for legal error. *State v. Roberts*, 291 Or App 124, 129, 418 P3d 41 (2018) (reviewing the invocation question for legal error); *State v. Mast*, 301 Or App 809, 820, 459 P3d 938 (2020) (reviewing whether evidence derived from the preceding Article I, section 12, violation for legal error).

A. *Violation of the Right to Counsel*

Article I, section 12, of the Oregon Constitution states that "[n]o person shall * * * be compelled in any criminal prosecution to testify against himself."[1] The right to counsel during custodial interrogation derives from the right against self-incrimination. *See State v. Scott*, 343 Or 195, 200, 166 P3d 528 (2007). "A suspect invokes the right to counsel by making a statement or request that a reasonable officer would understand as an invocation." *Roberts*, 291 Or App at 131.

"Invocations of one's Article I, section 12, rights may take one of two forms: unequivocal or equivocal." *Id.* at 132 (citing *State v. Schrepfer*, 288 Or App 429, 436, 406 P3d 1098 (2017)). An invocation is unequivocal when the suspect expresses a clear intent to invoke his or her rights, typically by a statement of "the desired action or view relating to the right in question (won't answer questions, don't want to talk, need a lawyer)." *State v. Nichols*, 361 Or 101, 110, 390 P3d 1001 (2017). In that circumstance, where a suspect in police custody unequivocally invokes the right to an attorney, the interrogation must immediately cease. *State v. Boyd*, 360 Or 302, 318, 380 P3d 941 (2016); *Schrepfer*, 288 Or App at 436 ("If the invocation is unequivocal, there is only one permissible response: interrogation must immediately cease.").

---

[1] Defendant also advances parallel arguments regarding the guarantee of the right to counsel under the Sixth and Fourteenth Amendments to the United States Constitution. Because we reverse and remand under the state constitution, and the scope of suppression would not be any greater under the federal constitution, we confine our analysis to state constitutional questions.

An equivocal invocation, on the other hand, occurs "when the suspect's statement or request is subject to more than one reasonable interpretation, one of which is that he or she is invoking the right to counsel." *Roberts*, 291 Or App at 132. "A statement that appears tenuous or equivocal in isolation may be a sufficient request for counsel when evaluated in the context of all of the circumstances." *State v. Sanelle*, 287 Or App 611, 624, 404 P3d 992 (2017), *rev den*, 362 Or 482 (2018) (internal quotation marks omitted). Ultimately, the question is whether, given the circumstances, a reasonable officer "would have understood at least one plausible meaning" of the suspect's statement or question "to be that [the suspect] was invoking the right to counsel." *Roberts*, 291 Or App at 133 (emphasis omitted).

In the case of an equivocal invocation by a defendant, police have two choices: They can (1) stop the interrogation or (2) ask the defendant "'neutral follow-up questions intended to clarify the equivocal nature of [the] defendant's statement.'" *State v. Dodge*, 297 Or App 30, 41, 441 P3d 599, *rev den*, 365 Or 533 (2019) (quoting *State v. Hickman*, 289 Or App 602, 606-07, 410 P3d 1102 (2017)). "Any question not reasonably designed to clarify the equivocal nature of the statement is impermissible." *Roberts*, 291 Or App at 133. That means that the questions following an equivocal invocation of the right to counsel must clarify specifically whether the suspect had intended to invoke *that* right, not other rights such as the right against compelled self-incrimination or the right to court-appointed counsel under Article I, section 11. *Sanelle*, 287 Or App at 627-28. In fact, as we observed in *Dodge*, questions directed at the suspect's understanding of other rights can impermissibly obscure matters: "[B]y asking a suspect whether he wishes to keep talking after he has invoked the right to counsel, officers at least deflect that invocation and risk suggesting to the suspect either that he does not have such a right or that the right will not be honored." 297 Or App at 42.

In this case, the state does not dispute that defendant's question—"Can we wait 'till [a lawyer's] present?"—was at least an equivocal invocation, a concession that is well taken. To put that question in context, detectives had

entered defendant's holding cell knowing that he had made previous statements about an attorney that they "[g]otta have him clarify," and defendant asked at the outset of their conversation in the cell whether a lawyer would be present in the interview room, to which one of the detectives responded, "A lawyer—is there one? Nope, there's no lawyers here." Defendant then asked, "Can we wait 'till one's present?" Given the context of defendant's inquiry, the question is not whether a reasonable officer would have understood at least one plausible meaning to be that defendant was invoking the right to counsel; it is whether that is the *only* plausible meaning.

Here, though, it is not necessary to decide whether defendant's invocation was unequivocal, because the questions that followed did not sufficiently clarify defendant's intent before the interrogation continued. Assuming for the sake of argument that defendant's invocation was only equivocal, Hall's initial attempt at clarification was permissible: He said, "We can always wait 'till one's present if that what you wanna do? Is that what you wanna do?" But defendant responded with uncertainty, saying "Umm." That required Hall to ask for further clarification if he wanted to proceed with the interrogation.

Hall's next statements were less straightforward attempts to clarify whether defendant had intended to invoke the right to counsel. He told defendant, "If you wanna wait for a lawyer—we'll wait for a lawyer. That's up—it's your choice—your call." But Hall also told defendant that he would "appreciate it" if defendant would keep talking to him and asked whether he wanted to do that—a practice that, as we observed in *Dodge*, can influence a suspect's decision and risks suggesting that an invocation will not be honored. 297 Or App at 42.

In any event, Hall did not obtain *any* clarification before detectives proceeded to interrogate defendant. Hall said, "I know you're just waking up so I don't wanna start asking you a bunch of serious questions when you're still groggy. So we can even start talking and then if you wanna stop at any point you can let me know and we can stop

talking too. So, those are kinda your options." Defendant's reply was ambiguous at best and wholly insufficient to clarify whether he had previously intended to invoke his right to counsel by asking whether he could wait for a lawyer. Defendant replied, "Oh yeah. Can you get me out of these clothes soon?" At no point after that did detectives revisit defendant's invocation of the right to counsel, and they proceeded to interrogate him without ever obtaining a clear answer to whether his earlier question had been intended to invoke the right to counsel.

Contrary to the trial court's ruling, police do not satisfy their obligations in the face of an equivocal invocation simply by repeating a suspect's rights while keeping the suspect talking.[2] Our case law holds that continued questioning must clarify whether a suspect invoked his right to counsel, not provide an opportunity to rethink it. *Dodge*, 297 Or App at 42; *Roberts*, 291 Or App at 133; *Sanelle*, 287 Or App at 627. Here, the interrogation proceeded without police ever obtaining a clear answer to what defendant had meant by his question, "Can we wait 'till [a lawyer's] present?" The detectives violated defendant's rights under Article I, section 12, by proceeding to interrogate him without that necessary clarification.[3]

---

[2] And, here, the detective did not even repeat all of the pertinent rights—such as the right to court-appointed counsel. Given that defendant was just waking up in a holding cell where he had been for hours, and had not been re-*Mirandized*, there was additional risk that defendant did not understand that his right to have a lawyer present included one at the state's expense in the event that he could not afford one. In that circumstance, the detective's selective recitation of defendant's rights had the potential to confuse defendant and further undermine his invocation of the right to counsel. *See Sanelle*, 287 Or App at 628-29 (explaining that, "not only was the detectives' follow-up an instance of failing to clarify what defendant meant—and, an instance of misdirection—the follow-up may have misled defendant into believing that he did not have a *Miranda* right to counsel during the interview" (citing *United States v. Botello-Rosales*, 728 F3d 865, 867 (9th Cir 2013), which held that a warning that, properly translated, informed the defendant that the right to counsel was contingent on the approval of a request or lawyer availability, was an "affirmatively misleading advisory [that] does not satisfy *Miranda*'s strictures")).

[3] There was argument below about whether the police were required to ask a binary, "yes or no" question to clarify defendant's intent. We have never proscribed the precise manner in which police must clarify an equivocal invocation, and we do not do so here. But, by way of example, a follow-up question like, "Are you asking for an attorney to be present, yes or no?" would be an effective means of clarification.

B.   *Scope of Suppression*

The remaining question is the effect of that violation. Defendant argues, as he did below, that the violation of his right to counsel requires suppression of all statements he made during his first and second interviews, as well as all derivative evidence illegally obtained as a result of the violation, including evidence obtained from the searches of his apartment, his phone, photographs of his person, collection of his finger nail scrapings, and his DNA. The state does not dispute that defendant's statements during both interviews must be suppressed, but it contends that the physical evidence was admissible (1) because defendant voluntarily consented to the search of his phone, and to the taking of DNA samples, photographs, and fingernail scrapings; and (2) the evidence found inside his apartment—including the victim's body, defendant's clothing, and the murder weapon—were discovered pursuant to a valid search warrant.

For the reasons explained below, we agree with defendant that all statements and physical evidence derived from his consent to searches must be suppressed, because the state failed to carry its burden to show that the evidence was not the product of the violation. However, we agree with the state regarding physical evidence discovered during the execution of the search warrant—a warrant that was supported by probable cause regardless of any statements obtained by police during the unlawful interrogation.

1.   *Exclusion of evidence derived from Article I, section 12, violations*

Where a defendant's Article I, section 12, right to counsel has been violated, the remedy for that violation extends not only to a defendant's uncounseled responses to a detective's questions but also to the physical and testimonial evidence that is the product of that violation. *See State v. Jarnagin*, 351 Or 703, 716, 277 P3d 535 (2012). "[W]hether testimonial or physical evidence derives from a prior [Article I, section 12] violation cannot be reduced to a mechanical formula but will vary depending on the totality of the circumstances." *State v. Swan*, 363 Or 121, 131, 420 P3d 9 (2018). In *Jarnagin*, the court described some of the relevant considerations:

"Among other things, the court has considered the nature of the violation, the amount of time between the violation and any later statements, whether the suspect remained in custody before making any later statements, subsequent events that may have dissipated the taint of the earlier violation, and the use that the state has made of the unwarned statements. \*\*\*. The inquiry is a fact-intensive one—whether, considering all the circumstances, a defendant's later decision to speak to officers is sufficiently a product of an earlier *Miranda* violation that suppression is necessary to vindicate the defendant's Article I, section 12, rights."

351 Or at 716-17.

The burden of production and persuasion is on the state to show that any statements or physical evidence it seeks to offer was not the product of the violation. *Swan*, 363 Or at 133; *State v. Vondehn*, 348 Or 462, 469-70, 236 P3d 691 (2010) (explaining that the Supreme Court has "long interpreted Article I, section 12, to impose no distinction between compelled statements and physical evidence derived from such statements or between the use of compelled statements to obtain evidence and as testimony at trial").

The Supreme Court's analysis in *Swan* is particularly instructive. In that case, the defendant was arrested for driving under the influence of intoxicants (DUII), and he invoked his right to counsel. Despite that invocation, the arresting officer proceeded to ask him 28 DUII interview questions and then asked if he would consent to a breath test, which he did. The defendant moved to suppress his answers to the 28 questions and all derivative evidence, arguing that his decision to take the breath test and the test results were the product of the violation. The state conceded the violation of the defendant's right to counsel, and the issue before the Supreme Court was "whether his decision to take the breath test derived from the immediately preceding Article I, section 12, violation." *Id.* at 130.

To determine whether the state had shown a break in the causal chain between the violation and the breath test results, the court looked to the factors that it had previously set forth in *Jarnagin*. Focusing on the second and third factors, the court concluded that the state failed to

carry its burden to show that the consent to the breath test was not the product of the Article I, section 12, violation because the answers obtained, which were not disclosed in the record, could have affected the defendant's decision to take the breath test: "Without knowing what [the officer] asked and what defendant answered, we have no way of determining that defendant's decision did not derive from the immediately preceding violation of his Article I, section 12, right to counsel." *Swan*, 363 Or at 132. The court explained that the defendant had remained in custody the entire time so there was "no break in time, place, or custody between the officer's repeated Article I, section 12, violation and defendant's decision to take the breath test that might have attenuated the effect of the violation." *Id.* It was "instead a case in which the prior illegality and defendant's decision to take the breath test blended into a continuum." *Id.*

2. *Testimonial statements and evidence derived from consent searches*

The state's arguments regarding the validity of defendant's consent to searches of his phone, photographs of his body, fingernail scrapings, and DNA swabs fail for reasons similar to those articulated in *Swan*. Here, defendant's consent was obtained late in the first interview after defendant had already admitted significant involvement in the murder, including inculpatory statements related to the phone, marks on his body, fingernail scrapings, and DNA that could have affected his willingness to consent to searches. There was no break in time, place, or custody between the violation of defendant's right to counsel and his decision to consent. Rather, like *Swan*, it was a case where the violation and the consent "blended into a continuum." 363 Or at 132. Because the state failed to show that defendant's consent was somehow attenuated from the violation of his right to counsel, the physical evidence discovered from those searches must be suppressed.

3. *Physical evidence discovered pursuant to search warrant*

We turn next to whether the violation of defendant's right to counsel requires suppression of the physical evidence discovered when police executed a search warrant

at his apartment after the first interview. According to the state, the trial court expressly ruled that the officers' initial entry onto the premises, which occurred before the first interview, "was valid pursuant to the consent of the homeowner," and also that the evidence later found inside when the warrant was executed—"including the victim's body, defendant's clothing, and the murder weapon—would have been inevitably discovered." Those rulings, the state submits, have not been challenged by defendant and require us to affirm the suppression of that physical evidence.

Defendant responds that the state is mixing and matching the court's rulings on two separate motions to suppress: his motion concerning the initial unlawful entry onto the premises and the motion raising the Article I, section 12, violation. He argues that, as for the latter, the state never alerted the trial court to what evidence derived from the unlawful interrogation: "[T]he entirety of the state's argument in response to defendant's motion to suppress was that defendant did not invoke the right to counsel. The state did not alternatively argue that particular evidence derived from the unlawful interrogation was nevertheless admissible, and the trial court never considered the issue." According to defendant, the trial court's conclusions about the validity of the search warrant were directed solely at the motion regarding unlawful entry onto the premises.

It is true that defendant filed separate motions to suppress, but the motions were not as analytically distinct as defendant suggests—nor were they litigated so separately. In the trial court, the state responded to defendant's first motion by arguing that the officers' initial entry was justified by the consent of the owner, Mohon, and by the emergency aid exception. The state then argued, alternatively, that all evidence found in the house during that initial entry inevitably would have been discovered because police "would have written a warrant to search the room because they clearly had probable cause based on Yucupicio-Pizano's observations *and discussion with the defendant.*" (Emphasis added.) That is, in response to the first motion, the state relied partly on the later interviews with defendant to argue that the search warrant inevitably would

have issued and that everything in the apartment would have been discovered.

In response to defendant's second motion—and contrary to defendant's representation on appeal—the state also raised the issuance of the search warrant in response to defendant's second motion under Article I, section 12. The state explained that a search warrant would have issued even without statements from the interview, and it set out pertinent parts of the affidavit supporting the warrant:

"In the unlikely event that the court concludes that the defendant invoked his right to an attorney and his consent was involuntary, the court should still find an adequate basis for the search of the defendant's residence based on the November 6, 2016 search warrant. *Even if the Court excises the interview with defendant from the warrant, there is more than enough evidence of the murder and reason to believe evidence of the crime of murder would be present in the outbuilding occupied by the defendant.* In his affidavit, Detective Jed McGuire writes:

"'Yuc[u]picio-Pizano told Detective Vreim, who in turn told me, that last night, November 4, 2016, he was over in [defendant's] outbuilding with [defendant] and a female friend that was with [defendant] watching a movie. Yuc[u]picio-Pizano said that he fell asleep on a small bed in the room, but awoke to [defendant] and the female arguing. Yuc[u]icio-Pizano said that he could not understand what they were fighting about because he does not understand English well. Yuc[u]picio-Pizano said that [defendant] and the female were arguing on [defendant's] bed when the female got up and sat on the couch. Yuc[u]picio-Pizano said he observed [defendant] get up from his bed, go over to the couch, and begin to stab the female with a knife. Yuc[u]picio-Pizano said that the female put her arms up to defend herself and began yelling "No! No!" Yuc[u]picio-Pizano said that at some point the female fell to the ground and [defendant] was over the top of her, continuing to stab her. Yuc[u]picio-Pizano could see that the female's chest and face were covered in blood. Yuc[u]picio-Pizano said the woman then goes motionless and he got up from the small bed and ran out of the outbuilding, [defendant's] residence.'

"This statement very explicitly lays out the anatomy of the [victim's] murder as directly witnessed by Yuc[u]picio-

Pizano. Certainly, this statement, provided to law enforcement by a named eye witness would establish probable cause to believe that the defendant's residence contained evidence of the murder, including trace evidence of blood and blood spatter, a knife or dangerous weapon used to kill or cut [J], property and belongings of [J], the body or human remains of [J], tools used to dispose of the human remains of [J], and clothing worn by the defendant or [J] during the murder. Yuc[u]picio-Pizano's statement is credible based on the nature of the disclosure made to law enforcement, and Yuc[u]picio-Pizano's demeanor during his reports to police.

"As the affidavit clearly establishes probable cause to search the defendant's residence for the items authorized in the warrant after excising any purported constitutional invalid statements by defendant, the warrant is valid and the search was constitutionally permissible. Therefore, the court should find that the evidence seized during the execution of the November 6, 2016 search warrant admissible in the defendant's forthcoming trial."

(Emphasis and alterations added.)

Both motions were heard at the same pretrial hearing, and the parties and trial court appreciated that some of the questions between the two motions overlapped in terms of suppression of defendant's statements and the physical evidence discovered during various searches. When the trial court asked the parties about the issuance of the search warrant, it did so with an eye toward striking not only what officers saw during the warrantless entry but also the uncounseled statements defendant made to detectives during the interview:

"THE COURT:   Taking out what the officers saw in the apartment and taking out the statement that [defendant] made to the detectives, do you think there is sufficient evidence for a search warrant affidavit?

"[Prosecutor]:   Absolutely. All the Court has to do—and I've highlighted it to some degree that the lion's share of it is to look at the statement provided by Detective McGuire with regard to what Mr. Yucupicio-Pizano told law enforcement officers with regard to what he witnessed, which is far more substantial than what the Court has been told in this hearing * * *.

"* * * * *

"So I believe that those statements alone in that provide adequate probable cause for the police to believe that the body of the victim would be in that residence and would be found underneath those floorboards as was predicted and talked about to some degree by Mohon in that affidavit as well."

The trial court took both motions under advisement and later issued oral rulings denying them. The court's oral rulings divided the issues generally along the lines of evidence obtained from searches (primarily the first motion to suppress) and statements obtained from defendant (primarily the second motion), but the court's reasoning regarding probable cause for the warrant was equally applicable to the second motion. The court's reasoning turned on what police knew from their own observations and the witness statements, not defendant's interview statements. The court ruled:

"Even if [it is true that police should have left], if at that point they should have realized that she was deceased, *everything up to that point, including the witness statements of seeing her stabbed at the location; the testimony that the floorboards had been in disarray from the owner, who knew exactly what they would normally look like. And then I think that by itself would be enough for a warrant, I think. You can add on that what they observed themselves up to the point where they noticed that there was something buried under there.* Even if [defense counsel] is correct and they should have known at that point that there was no hope of survival, which I don't agree with, but even if then, they had enough to get a warrant. * * *

"So I think, in fact, that this is a case with inevitable discovery."

(Emphasis added.)

Given that procedural history, we reject defendant's primary contention, which is that the state is now raising arguments on appeal that were neither presented to nor decided by the trial court. If anything, the state's arguments regarding the independent validity of the search warrant

were better developed in the trial court than they are in the briefing on appeal.

Turning to the merits of those arguments, we agree with the state that the evidence discovered by executing the search warrant did not derive from the violation of defendant's rights under Article I, section 12. As the court explained in *Swan*, the question whether evidence derives from an Article I, section 12, violation cannot be reduced to a mechanical formula and varies depending on the totality of the circumstances. 363 Or at 131. And, in this case, the record leaves no doubt that a search warrant would have issued for defendant's apartment regardless of anything that happened when defendant was interrogated.

Before detectives arrested and interrogated defendant, Yucupicio-Pizano had told police that he witnessed defendant stabbing J in defendant's apartment; Yucupicio-Pizano had told them that J was underneath the floor; police had entered the apartment and seen plywood askew, saw blood and what appeared to be a fresh mound of loose soil, had moved soil and located a fleece blanket in the dirt, and had smelled an odor of decomposition and fecal matter after moving the blanket. That information was in the search warrant, and, as the state argued below, was sufficient to establish probable cause to believe that evidence of a murder would be found in the apartment. Because there was probable cause for the issuance of the warrant regardless of the Article I, section 12, violation, the trial court correctly declined to suppress evidence found while executing the search warrant at the apartment. We therefore do not disturb that aspect of the court's suppression ruling.

C. *Harmlessness*

Last, we briefly address the question of prejudice. The state suggests that, as long as evidence discovered at the apartment was admissible, any error in failing to suppress other evidence—including defendant's confession to the murder—was somehow harmless. We reject that argument without extended discussion. Defendant confessed to the murder following the violation of his right to counsel, gave shifting stories on whether he acted in self-defense, and

made other inculpatory statements that affected his ability to defend himself. The state's harmlessness argument also fails to account for any of the inculpatory physical evidence that derived from the consent searches, which included DNA evidence linking defendant to the murder. The trial court's error requires us to reverse defendant's conviction and remand for a new trial.

Reversed and remanded.